Dean HOYE, Trustee of the Estate of
Guaranty Trust Company,
Plaintiff-Appellee,

v.

J.R. MEEK, an individual,
Defendant-Appellant.

No. 84–2082.

United States Court of Appeals,
Tenth Circuit.

June 27, 1986.

Rehearing Denied Aug. 5, 1986.

B. Hayden Crawford, (Mary N. Birmingham with him, on brief) Crawford, Crowe & Bainbridge, Tulsa, Okl., for defendant-appellant.

W. Rogers Abbott, II, Oklahoma City, Okl., for plaintiff-appellee.

Before LOGAN, MOORE and TIMBERS*, Circuit Judges.

TIMBERS, Circuit Judge.

Appellant J.R. Meek appeals from a judgment entered March 14, 1984 in the Western District of Oklahoma, Thomas R. Brett, *District Judge*, holding that appellant had breached his duty of care as a director and as president of the Guaranty Trust Company. The court entered judgment against appellant for specific investment losses incurred by the company in the amount of $1,419,660.48. Since appellant conceded at argument before us that the district court's findings of fact are not clearly erroneous, the primary issue on appeal is whether the district court erred as a matter of law in holding that appellant violated the prudent man standard of a corporate director set forth in 18 Okla.Stat.Ann. § 1.34(b) (1951).

For the reasons set forth below, we affirm.

I.

We shall summarize only those facts believed necessary to an understanding of the issues raised on appeal. The facts are straightforward and undisputed.

This appeal arises from an action commenced by Dean Hoye, the trustee in bankruptcy of the estate of Guaranty Trust Company ("Guaranty" or "company"),

* Of the Second Circuit, sitting by designation.

against members of the Guaranty board of directors, members of the Meek family, and corporations owned by Meek family members. Although not the subject of this appeal, the trustee's action also involved banking code violations, misapplication of bank funds, and diversion of profits. Prior to trial on the breach of director duty claim, two directors settled with the trustee and one director died.

On December 29, 1978 Guaranty filed its Chapter XI petition in bankruptcy—later converted to a Chapter X proceeding. A major cause of Guaranty's financial problems stemmed from its highly leveraged investment in Government National Mortgage Association certificates ("GNMAs" or "Ginnie Mays") between January 1977 and December 1978. The GNMA investment gave Guaranty a pro rata share of a pool of first mortgage home loans. Guaranty sustained increasing losses on the investment as interest rates rose during this two-year period. In holding that appellant had breached his duty of care, the district court focused upon appellant's failure to curb the GNMA investment while the losses resulting from the investment exceeded the company's assets, appellant's failure to monitor investment decisions and results, and the excessive authority which appellant delegated to his son.

Our review of the testimony and exhibits convinces us that the district court's holding of liability on the part of appellant was correct as a matter of law. Our evaluation of the application of the relevant Oklahoma statute, 18 Okla.Stat.Ann. § 1.34(b), requires an examination of the organization and management of Guaranty, the nature of the GNMA investment, and appellant's role in the company.

Guaranty was an Oklahoma chartered trust company based in Ponca City. It engaged in business under the laws of Oklahoma for approximately eight years. It formerly was known as Security First Trust Company. In addition to its trust and fiduciary services, Guaranty also received deposits and issued time and passport certificates. Guaranty's board of directors included appellant and his wife; appellant's son, Maxwell E. Meek; and three "outside" directors. The latter were an accountant, a lawyer and a banker. In addition to serving as chairman of the board of directors, appellant also was president of the company. Maxwell Meek ran the day-to-day operations of the company. The board of directors was responsible for policy decisions. One of Guaranty's stated investment policies was that no more than $100,000 would be placed in a single type of investment. Excepted from this limitation were government securities.

For approximately seven years the company operated at a profit. During this time periodic bank examinations did not disclose major problems. In 1978, however, a bank examiner uncovered serious problems with the company's records. They did not reflect accurately the company's recent investment in GNMAs, its liability on the investment, nor the attendant risks associated with the investment.

In January 1977, through the initiative of Maxwell Meek, and apparently unknown to appellant and the other directors, the company had begun investing in GNMAs which were subject to repurchase contracts. At the end of the term of repurchase contract, Guaranty had the option of paying its broker the full purchase price for the securities and taking delivery, allowing the broker to liquidate the securities at market, or renewing the repurchase contract. Guaranty continuously opted to roll-over the investment through repurchase contracts. The market price of the GNMAs fluctuated with varying interest rates. As interest rates rose during the two-year period involved, the market value of the GNMAs declined. Thus, Guaranty continually was faced with the question whether to sell the GNMAs at a loss as interest rates rose or hope that the losses would be offset at some future date when interest rates might decline.

The investment did not violate the letter of Guaranty's stated investment policy that no more than $100,000 would be placed in a particular investment, since GNMAs as

government securities were an exemption to this policy. Undoubtedly the policy was intended to prohibit unnecessary risks—a policy appropriate for a company such as Guaranty which served as a fiduciary and received deposits. Guaranty's particular method of financing the GNMAs, however, did violate the spirit of its investment policy. Guaranty's predicament resulted from purchasing the GNMAs on a highly leveraged basis. By financing the investment with borrowed money, Guaranty also had to pay the broker interest. As interest rates rose, not only did the market value of the GNMAs decline, but also the interest on financing exceeded the yield on the investment. At the end of 30, 60, and 90 day roll-over periods, Guaranty had to pay interest to the broker and cover any market price differential on the GNMA investment.

Within two months from the initial investment, Guaranty sustained a loss of $521,420.90 because of the repurchase contracts and leveraged financing. By October 1977, the money allocated to repurchase contracts, $628,219.77, exceeded the net worth of the company. Between October 1977 and December 1978, when Guaranty filed its Chapter XI bankruptcy petition, the company spent an additional $790,-717.62 on the GNMA repurchase contracts. Within two years, the losses resulting from the GNMA investments and repurchase contracts totalled $1,418,937.39.

## II.

Against this background, we turn to the question whether the district court erred in holding that appellant J.R. Meek breached his duty of care as a director and president of Guaranty, and therefore was liable under the Oklahoma statute.

The obligations of a director are set forth in 18 Okla.Stat.Ann. § 1.34(b) which provides:

"The directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge their duties in good faith, and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in like position."

As the basis for its holding of breach of duty and imposition of liability, the district court focused upon appellant's delegation of too much discretion to his son, Maxwell Meek; his failure to monitor his son's activities; and the maintenance of the GNMA investment as losses and repurchase costs ballooned.

It is undisputed that appellant was a highly regarded and successful banker in Oklahoma. The outside directors testified that they regarded appellant as Guaranty's primary policymaker. Between 1943 and 1969 appellant had served as president and principal stockholder of Security Bank and Trust Company in Ponca City. In 1964 appellant incorporated Security First Trust Company, which became active in 1970 as Guaranty. Unquestionably, customers were drawn to Guaranty because of appellant's solid reputation and expertise. Beginning in 1972 appellant spent considerable time residing in Vermont, rather than Ponca City. Nevertheless, he retained his positions as chairman of the board of directors and as president of Guaranty. Appellant was outside of the country at the time his son made the initial investment in GNMAs.

Appellant, in attempting to dispute the court's holding of a breach of duty and imposition of liability, points to the fact that it was his son who made the initial investment decision. Appellant also argues that because of his semi-retired status, his duty of care somehow should be lessened. We disagree. We hold that the district court correctly applied the Oklahoma statute.

True, appellant did not make the initial decision to invest in GNMAs on a highly leveraged basis. The essence of appellant's breach of duty, however, was his failure to monitor Guaranty's activities. Appellant testified at trial that while he was living in Vermont he was in communication with his son. He also testified that "[o]n occasion Maxwell would send me monthly reports of the directors meeting

and if I saw something in that report that I needed information about, I might call Maxwell or I might write to him." Appellant also testified that he "occasionally" attended Guaranty's board meetings in Ponca City. The remaining directors regularly attended the monthly board meetings. Further, appellant testified that he did not knowingly cause the assets of Guaranty to be valued in excess of their actual costs, and that he did not knowingly allow Guaranty to incur indebtedness beyond its capital and surplus.

In response to appellant's assertions, it should not be forgotten that the Oklahoma statute codifying a director's duty of care sets forth an objective standard of an ordinarily prudent man. There is no separate standard for an ordinarily prudent non-resident director or an ordinarily prudent semi-retired director. The standard does not vary depending upon one's residence or retirement status. The obligation to the corporation, and ultimately to the creditors and depositors, is the same. After all, we are applying a standard of care which the legislature intended to govern those who are charged with responsibility for other people's money.

Appellant did not attend board meetings regularly nor, despite his position as chairman of the board, did he preside at board meetings. At trial, appellant testified that he did not recall in what month he realized that the company was borrowing money to invest in GNMAs. We are not persuaded by appellant's argument that, because Maxwell had operated the company at a profit for seven years, the directors' and president's duty to monitor activities was dissipated. As the court held in *Preston-Thomas Construction, Inc. v. Central Leasing Corp.*, 518 P.2d 1125, 1127 (Okl. App.1974), directors and officers are charged with knowledge of those things which it is their duty to know and ignorance is not a basis for escaping liability. Where suspicions are aroused, or should be aroused, it is the directors' duty to make necessary inquiries. We hold that appellant failed to make the necessary inquiries. He had a duty to keep abreast of Guaran-

ty's investments, particularly investments that posed a double risk of decrease in market price and an increase in transactional costs.

Appellant of course would not be required to have the ability to predict increasing interest rates during the two-year period here involved. A decision made in good faith, based on sound business judgment, would not alone subject appellant to liability. In *Financial Industrial Fund v. McDonnell Douglas*, 474 F.2d 514, 518 (10th Cir.1972), we recognized that the business judgment rule shields a director from liability in the case of an honest error in judgment. But in order to come within the ambit of the business judgment rule, a director must be diligent and careful in performing the duties he has undertaken. In the instant case, appellant's breach of duty resulted from both his delegation of authority to Maxwell without adequate supervision and his failure to avert Guaranty's continued exposure to increasing indebtedness. At each monthly board meeting during this two-year period, the directors could have decided to halt this increasing exposure to risk.

Assuming appellant's good faith, that alone was not sufficient to shield him from liability. It is undisputed that, as Guaranty was on the verge of filing for bankruptcy, appellant attempted to find other sources of capital for the company. This eleventh hour effort, however, was not sufficient to fulfill his duty of care as a director and president. The Oklahoma statute requires good faith *and* the diligence, care and skill of a prudent man.

In the instant case, the district court had the opportunity to evaluate the testimonial demeanor and trustworthiness of appellant and his son, other members of the board of directors, bank examiners, and securities brokers. We have reviewed their testimony, as well as the exhibits, records, and other documents received in evidence. We are convinced that the court did not err in its evaluation of appellant's activities and omissions. *See Anderson v. City of Bes-*

*semer City*, 470 U.S. 564, ——, 105 S.Ct. 1504, 1512 (1985); *American National Insurance Co. v. Fidelity Bank, N.A.*, 691 F.2d 464, 468 (10th Cir.1982). Nor did the court err in applying the Oklahoma statute. The statute sets forth an objective standard of care, one which imposes a duty that does not vary with residence or retirement status. We emphatically reject appellant's assertion that the court stretched the statute beyond its intended application.

### III.

To summarize:

We hold that the district court correctly concluded that appellant breached his duty of care as a director and as president of Guaranty. Although the business judgment rule shields a director from liability in the case of good faith decisions within the director's discretion, appellant in this case clearly breached his duty of care. Appellant failed to monitor the investment decisions of his son, delegated too much authority to him, and failed to respond to Guaranty's increasing exposure to risk.

AFFIRMED.