C. Gerald HARGRAVE, a member and Customer of Canadian Valley Electric, Inc., a Cooperative Corporation, on behalf of Himself and all Other Members and Customers, Appellants,

v.

CANADIAN VALLEY ELECTRIC COOPERATIVE, INC., an Oklahoma Corporation, E.E. Proctor, Ray Masengale, Roy Brewer, J.P. Duvall, Laurence J. Kunze, L.D. Freeman, Raymond I. Reynolds, Raymond M. Knight, and John W. Brockman, Trustees/Directors of Canadian Valley Electric Cooperative, Inc.,

and

Western Farmers Electric Cooperative, an Oklahoma Corporation, and Clark T. McWhorter, J.C. Murray, Donald A. Bean, Earl L. Sloan, Doyle Marlett, Raymond M. Knight, J.M. Goin, Roy Counts, Marvin Scherler, Robert Stooksberry, W.R. Hutchinson, Dale Shaw, A.H. Weichel, Eugene Blackketter, Earl Petree, Ted LaMar, Ralph E. Caldwell, Glen Northcutt, and Lloyd P. Wylie, Trustees/Directors of Western Farmers Electric Cooperative, Appellees.

No. 66188.

Supreme Court of Oklahoma.

April 24, 1990.

As Corrected May 8, 1990.

Robert H. Anderson, Gary E. Payne, Eagleton, Nicholson, Jones, Blaney & Pringle, Oklahoma City, for appellants.

Almon E. Henson, Henson, Henson, Henson & Marshall, Shawnee, for Canadian Valley Elec. Co-op. Inc., and Trustees.

Leslie Pain, Pain and Garland, Anadarko, for Western Farmers Elec. Co-op. and Trustees.

Larry Derryberry, Patrick D. Shore, Derryberry, Quigley, Parrish & Solomon, Oklahoma City, for Western Farmers Elec. Co-op., et al.

SUMMERS, Justice:

This is a class action brought by a utility ratepayer against a rural electric distribution cooperative corporation and its trustees, and a rural electric generating and transmission cooperative corporation and its trustees. The ratepayers attack a wholesale power contract executed be-

tween the two cooperatives. We are called upon to determine whether summary judgment was properly granted in favor of the defendants. With regard to the ratepayers' contention that particular contract provisions are discriminatory and thus against public policy, we find a remaining factual controversy and remand to the trial court. We do likewise on ratepayers claim that the Trustees breached their fiduciary duties. As to other propositions we affirm the trial court's order of summary adjudication.

## THE FACTS AND POSTURE OF THE CASE

Gerald Hargrave, a ratepayer, filed a class action suit in the Seminole County District Court against Canadian Valley Electric Cooperative Inc. [Canadian] and its trustees, and Western Farmers Electric Cooperative [Western] and its trustees. Canadian is a rural electric distribution cooperative. Western is a rural electric generating and transmission cooperative whose members are distribution cooperatives such as Canadian.

Hargrave asserted several different causes of action, all arising out of a contract between Canadian and Western. Referring only to those parts of his petition urged in his brief on appeal,[1] Hargrave alleged that the contract between Western and Canadian was lacking in consideration. He also claims that the trustees of both Canadian and Western breached their fiduciary duty by agreeing to certain terms in the contract, and by not rescinding the contract when they saw its results. He further claimed that the trustees grossly mismanaged Canadian assets by failing to take action to reform or rescind the contract. Finally he asserted that the members of his class of ratepayers were victims of unjust discrimination, contrary to the statutorily expressed public policy of the state.

From 1951 to December 1977 Canadian received its electric power under a contract with the Southwestern Power Administration (SPA), an agency of the federal government. In 1968 the SPA notified Canadian that it would not continue to supply "base" power after the expiration of the contract, but would only supply "peaking" power. Canadian, along with several other SPA customers, formed an organization called the "Sooner Group" and began investigating other sources of long-term power. In 1973, the Sooner Group, including Canadian, contracted with Western for a long-term supply of power.

The contract between Western and Canadian was for thirty-seven (37) years, and involved not only Western's building of additional facilities in order to meet the needs of Canadian, but also a transfer of assets, such as power stations and lines, from Canadian to Western. The contract stated that Western was unable to supply power immediately and that Canadian should continue to obtain its power from SPA until the end of the SPA contract term. However, the contract required Canadian to pay to Western the difference between the amount actually paid to the SPA for power, and the amount Western would have charged had it furnished the electricity, based on a rate chart incorporated into the contract.

Between the years of 1974 and 1977, Canadian paid some four million dollars to the SPA for power supplied to Canadian customers, such as Hargrave. Canadian paid another four million dollars to Western, based on the rate Western would have charged had it provided the power. Because of these additional costs, Canadian began charging its customers a "blended" or higher rate, which combined the costs of power supplied by the SPA with those costs incurred from Western. Thus, Hargrave and other plaintiff ratepayers in the class paid eight million dollars for four million dollars worth of power. At no time during this period did Western actually

---

1. In his petition, Hargrave asserted three different causes of action. Summary Judgment was granted on all three. Hargrave only appealed the ruling as to the first cause of action, which contained several different theories of recovery. The second and third causes involved the sale of Canadian assets to Western at depreciated book value.

supply power to Canadian. After the expiration of the SPA contract, Western did begin to supply power according to the terms of the Canadian/Western contract.

The district court certified the case as a class action, and allowed customers of Canadian to "opt out" of the class. At the end of the "opt out" period, there were approximately ten thousand plaintiffs who had chosen to remain in the suit.

Canadian and Western, along with their trustees, filed motions for summary judgment, alleging that there were no material factual disputes. Defendants also argued that Ratepayers were procedurally barred from bringing suit because they had not first demanded action be taken by the corporation. The court withheld judgment and ordered the parties to present a list of stipulated facts. Ratepayers submitted a list of stipulations to the defendants, and over twenty (20) of the suggested stipulations were rejected by the defendants. After a long delay, the parties together presented the trial judge with a list of stipulated facts. Thereafter, the judge granted the defendants' motions for summary judgment as to all three causes of action, and Ratepayers appealed. In their petition in error, Ratepayers only question the propriety of summary judgment as to the first cause of action.

In an unpublished opinion the Court of Appeals reversed the trial court's order granting summary judgment, holding that "there is no sufficient basis for requiring Canadian customers to pay Western for power generation and distribution when Western was neither generating, selling or distributing power...." The district court was directed to determine the amount of overcharges and refund it to plaintiffs. From this the defendants filed a petition for writ of certiorari, which was granted by this Court on July 6, 1989.

### RATEPAYERS' FAILURE TO DEMAND ACTION

Initially we must address the procedural question of whether Ratepayers' failure to demand that the trustees take action is a bar to the suit. Plaintiff ratepayers agree that no demand was made to the trustees of either Canadian or Western. However, in Ratepayers' second amended petition and on appeal they contend that any such demand would have been futile, as evidenced by the actions of the trustees of Canadian and Western.

We agree that general rules which apply to shareholder derivative actions apply in this situation involving a class of consumers, inasmuch as both Canadian and Western are incorporated as cooperative corporations. *See* 18 O.S.1981, §§ 421 and 437.1. A stockholder, or in this case, a customer of Canadian, may bring suit only when the corporation refuses to maintain or defend an action. *Barnett v. Bodley*, 348 P.2d 502, 505 (Okla.1959). Ordinarily before a court will entertain an action brought by shareholders, the shareholders must first show that they sought relief through corporate channels without success. *Guaranty Laundry Co. v. Pullium*, 191 P.2d 975, 979 (Okla.1948).

The exception to this rule is when any request for action within the corporation would have been futile. *Id. See also Lewis v. Graves*, 701 F.2d 245, 248 (2nd Cir.1983); *Bell v. Arnold*, 487 P.2d 545, 547–48 (Colo.1971). A demand on the board of trustees or directors should not be required prior to institution of a derivative action if the allegations in the petition permit the inference by the court that the trustees or directors upon whom demand would be made lack the "requisite disinterestedness to determine fairly whether the corporate claim should be pursued." *Lewis v. Curtis*, 671 F.2d 779, 785 (3rd Cir.1982) *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). The purpose behind this exception is to allow the trustees or directors of the corporation the opportunity to "occupy their normal status as conductors of the corporation's affairs." *Lewis v. Graves*, 701 F.2d at 247, *quoting Brody v. Chem. Bank*, 517 F.2d 932, 934 (2nd Cir. 1975). Whether or not an action would have been futile depends on the facts and circumstances of each case, and lies within

the discretion of the trial court. *Lewis v. Graves*, 701 F.2d at 248. In making this determination, the court should consider "whether a demand on the directors would be likely to prod them to correct a wrong." *Lewis v. Curtis*, 671 F.2d at 786.

■ Such "demand is presumptively futile where the directors are antagonistic, adversely interested, or involved in the transactions attacked." *Lewis v. Graves*, 701 F.2d at 248. In the present case, it was the trustees of Canadian and Western, acting on behalf of their respective corporations, who negotiated the contract. It was the trustees who allowed the contract to proceed unaltered even though approximately four million dollars was paid to Western for power not generated or transmitted by Western. We cannot agree that a complaint by Ratepayers would have prodded the trustees to action. They were not disinterested parties, but were directly involved in the transaction. Hence, we agree that plaintiffs were not required to first bring this complaint before the trustees, as these were the people committed to the course of action complained of. Such an act undoubtly would have been useless and futile, and would have served merely to "delay suit and remedy." *Lewis v. Curtis*, 671 F.2d at 785. See also *Pulliam*, 191 P.2d at 979.

## LAW OF SUMMARY JUDGMENT

■ Summary judgment is a procedural device used to reach a final judgment where there is no dispute as to any material facts. *Manora v. Watts Regulator Co.*, 784 P.2d 1056 (Okla.1989). The trial court may look beyond the pleadings to evidentiary material to determine whether any issue remains for jury determination. *Flanders v. Crane*, 693 P.2d 602, 605 (Okla.1984). The court may consider evidence outside the pleadings such as depositions, admissions, answers to interrogatories and affidavits. 12 O.S.1981, Ch. 2 App., Rule 13. All inferences in the evidence must be taken in favor of the party opposing the motion. *Manora*, 60 O.B.J. at 3003. Summary judgment is improper if under the evidence, reasonable men could reach differ-

ent conclusions from the facts. *Runyon v. Reid*, 510 P.2d 943, 946 (Okla.1973). The moving party has the burden of showing that there is no substantial controversy as to any material fact. *Loper v. Austin*, 596 P.2d 544, 545 (Okla.1979). After this showing, the opposing party must demonstrate that existence of a material fact in dispute which would justify a trial. *Martin v. Chapel, Wilkinson, Riggs & Abney*, 637 P.2d 81, 84 (Okla.1981). These burdens of proof may be met by circumstantial evidence. *Manora*, 60 O.B.J. at 3003.

At the trial court level defendants urged that no questions of fact remained for the jury. They relied heavily on the stipulations of fact agreed to by both parties. Ratepayers objected to summary judgment, but did not specifically set forth a list of disputed facts. However, Ratepayers did enunciate several general areas in which they claimed factual disputes remained. These areas will be discussed in turn.

## CONSIDERATION

■ Ratepayers first argue that summary judgment was improper because there was no consideration for the contract between Canadian and Western, making the contract unenforceable. To reach this conclusion, the ratepayers rely on the fact that Western supplied no power to Canadian for almost four years while receiving payments from Canadian customers. The problem with this argument is that it fails to recognize that the contract was to extend for a period of thirty-seven years, and that Canadian immediately received an equity position ($1/19$) in Western, a going concern. Western began building additional facilities in order to supply the needed power, and made large expenditures to cover these expenses. Western was also responsible for maintaining the lines and stations. After the SPA contract was concluded, Western began supplying "base" power to Canadian as required by the contract.

■ A "want of consideration" has been defined as a total lack of any consideration for a contract. "A plea of want of consideration amounts to a contention that

the instrument did not become a valid obligation in the first place." *Mercury Inv. Co. v. Woolworth Co.*, 706 P.2d 523, 533 (Okla.1985). As a general rule, consideration exists as long as there is a benefit to the promisee or a detriment to the promisor. *See* 15 O.S.1981, § 106; *State ex rel. Derryberry v. Kerr–McGee Corp.*, 516 P.2d 813, 820 (Okla.1973). "Prejudice suffered or agreed to be suffered other than which a person is lawfully bound to suffer at the time of consent, is sufficient consideration for the promise of another and will, in conjunction with the other essential elements of a contract impart to such promise the finding force of a contract." *Id.*, citing *Powers Restaurants, Inc. v. Garrison*, 465 P.2d 761, 763 (Okla.1970) and *Zoeller v. Graham*, 230 P.2d 904, 906 (Okla.1951).

 Furthermore, consideration is presumed if there is a written instrument, as there is here. 15 O.S.1981, § 114; *Earth Products Co. v. Oklahoma City*, 441 P.2d 399, 403 (Okla.1968). It is the burden of the party seeking to invalidate the contract to show that there is a want of consideration. 15 O.S.1981, § 115; *Silk v. Phillips Petroleum Co.*, 760 P.2d 174, 180 (Okla.1988).

The argument put forward by the ratepayers is similar to that in *Silk*. There, the plaintiff was seeking to invalidate a clause in an oil and gas lease which allowed the lessee-defendant the option to renew the lease. The plaintiff urged that the option clause was not supported by consideration. This Court rejected the idea that separate consideration was necessary to support the clause:

' ... The Court has no right to fractionalize contracts or divide it up into sections, and say that the cash bonus supports any particular covenant to the exclusion of another ... The conclusion that the cash bonus paid upon the execution and delivery of the lease supports each and all of the terms and conditions contained therein, including the surrender clause, is sustained by all the Courts except in those cases where a nominal consideration was rendered and was held insufficient. ... ' *Northwestern Oil & Gas Co.*

*v. Branine*, 71 Okla. 107, 175 P. 533, 536 (1918).

Similarly, this Court will not "divide" the contract between Canadian and Western so as to require separate consideration for each clause. The parties agreed that in exchange for a long-term supply of power, Canadian would make payments according to the specified rates. Western agreed to build additional facilities to facilitate the supply of power to Canadian Valley customers, and did, in fact, begin constructing the facilities. After the expiration of the SPA contract, Western begin supplying power to Canadian customers. Hence, we cannot say that the contract, as a whole, fails for want of consideration.

 Generally, the sufficiency of consideration is a question of law to be determined by the court. *Evans v. Oregon*, 58 Wash. 429, 108 P. 1095, 1097 (1910). Only when there is an evidentiary conflict between the statutory presumption of consideration and evidence presented to the trial court will it become a question of fact. *See, e.g., Ferraro v. Fink*, 191 Kan. 53, 379 P.2d 266, 269 (1963). Here, there is no dispute as to the benefit to the promisee (Canadian) and the detriment to the promisor (Western); it is clearly stated in the contract. The only dispute involves the "divisibility" of the contract so as to require consideration for each provision. This is a question of law rather than fact, and the trial court correctly ruled for the defendants on this theory of recovery.

## FIDUCIARY DUTY OF THE TRUSTEES

Ratepayers next argue that summary judgment was improper because the trustees of both Canadian and Western were guilty of gross negligence and breach of their fiduciary duty by failing to take action when it became apparent that the fuel prices charged by Western were much higher than expected. The trustees disagree, stating that they acted in good faith and fulfilled their duties by using ordinary care in exercising their business judgment. They point out that it could not have been known that fuel prices would escalate to

such high levels. In any event, the trustees claim that they accomplished their main objective—to secure long-term power for the customers of Canadian Valley.

Defendants point out that 18. O.S.1981, § 1.34(b) specifies the duty owed by trustees and directors:

> b. The directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge their duties in good faith, and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in like position.

Although Section 1.34(b) was repealed by the new General Corporation Act, the new act, 18 O.S.Supp.1986, § 1003, requires that rights, privileges, immunities and liabilities accrued under the old act "shall not be impaired, deminished or affected." Hence, Section 1.34(b) is applicable to the case at bar.

While a trustee is charged with a fiduciary duty, liability cannot be imposed if the trustee has acted with the care and diligence of an ordinarily prudent man under similar circumstances. The "business judgment rule" shields a director or trustee from liability in the case of an honest error in judgment. *Hoye v. Meek*, 795 F.2d 893, 896 (10th Cir.1986) (applying Oklahoma law); *Lewis v. Curtis*, 671 F.2d 779, 786 (3rd Cir.1982). Because directors and trustees are the "managers" of corporate affairs, wide latitude is given in order that the corporation may be managed efficiently. *See Cramer v. Gen. Tel. & Electronics Corp.*, 582 F.2d 259, 274 (3d Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1978); *Nursing Home Bldg. Corp. v. DeHart*, 13 Wash.App. 489, 535 P.2d 137, 144 (1975).

Ratepayers have alleged gross or culpable mismanagement in the affairs of the cooperative. The Canadian Trustees had a fiduciary duty to the customers of Canadian, and the Western Trustees did likewise once the Canadian members became Western customers. Plaintiffs allege that instead of taking reasonable steps to ease the unfair burden on them when fuel costs went up the Trustees were parties to "accounting manuvers" which "hid" the reason for the increase in the fuel bills. It appears controverted issues of fact remain in this area. Summary Judgment is premature if reasonable people could reach different conclusions from the facts. *Runyon v. Reid, supra.*

## PUBLIC POLICY AND THE "DOUBLE PAYMENT" PROVISION

Ratepayers urge that summary judgment was improper because the contract provision requiring payment for electric power which was not supplied by Western was contrary to public policy due to its discriminatory nature, and was therefore void. By paying for power and the estimated fuel cost to supply such power, Ratepayers argue that they were forced to subsidize the other customers of Western. Western responds that this payment was not discriminatory or arbitrary with regard to appellants, because all of Western's customers were paying the same rate for power. Western also relies on the fact that the contract was approved by the Rural Electrification Administration and the Corporation Commission.

There is a statutorily expressed public policy in Oklahoma forbidding discrimination by public service corporations. Title 79 Okla.Stat.1981 § 4 states:

> Whenever any business, by reason of its nature, extent, or the existence of a virtual monopoly therein, is such that the public must use the same, or its services, or the consideration by it given or taken or offered, or the commodities bought or sold herein are offered or taken by purchase or sale in such a manner as to make it of public consequence or to affect the community at large as to supply, demand, or price or rate thereof, or said business is conducted in violation of the first section of this article, said business is a *public business,* and subject to be controlled by the state, by the Corporation Commission or by an action in any district court of the state, as to all of its practices, prices, rates and charges. And it is hereby declared to be the duty of

any person, firm, or corporation engaged in any public business to render its services and offer its commodities or either upon reasonable terms *without discrimination* and adequately to the needs of the public, consideration the facilities of said business. (emphasis added)

Although rural electric cooperatives are not subject to the same degree of Corporation Commission control as some other public utilities, *See* 17 O.S.1981, § 158.27, they are nonetheless considered public service corporations.

"There can be no doubt that rural electric cooperatives in Oklahoma are public service corporations ... 'Public Utility' as defined in 17 O.S.1961, § 151, is broad enough to include rural electric cooperatives ..." *Public Service Company of Okla. v. Caddo Elec. Coop,* 479 P.2d 572, 581 (Okla.1971).

Section 4 referred to above codifies the common law that "all persons engaged in a public business" have a duty to "treat members of all who are similarly situated ... on equal terms and at reasonable rates." *Consumer's Light and Power Co. v. Phipps,* 251 P. 63 (Okla.1926). The *Phipps'* case, *supra,* after noting that the statute now found at 79 Okl.Stat.1981, § 4 declared the common law, went on to describe the discrimination that is prohibited:

"This rule requiring those engaged in a 'public business' to render service to the public without discrimination does not mean a uniformity of rates or prices for services rendered to the public. A 'public business' cannot be required to charge the same rate for services rendered to different classes, or to people different situated. The discrimination that is prohibited must be an *arbitrary* or an *unjust* discrimination. A mere difference in prices for a commodity furnished to different classes would not constitute an unjust discrimination. As said by Fletcher on Corporation, vol. 7 p. 7185:

\* \* \* \* \* \*

" 'It is only arbitrary discriminations that are unjust. If the difference in rates is based upon a reasonable or fair difference in conditions which equitably and logically justified a differ-

ent rate, it is not an unjust discrimination. In fact, this question of discrimination narrows itself to a determination of whether a discrimination, conceding it to exist, is just; i.e. based on reasonable grounds, or is unjust; i.e., merely arbitrary. There is no unjust discrimination if all persons similarly situated affected by like conditions and subject to like circumstances are given the same rate.' " (emphasis added) (Id. at 65)

It is this statement of principles upon which the Ratepayers rely. They claim the conditions and circumstances affecting them were materially different from those affecting the original Ratepayers of Western. They argue that their being charged by Western for electrical power they did not receive in an amount identical to the rate Western charged its original members to whom it actually furnished power, is a difference so pervasive as to be arbitrary, unjust, and therefore unlawful.

Although we need not rule on whether § 4 gives rise to an independant cause of action, the public policy it pronounces may become of concern to the courts in a proper proceeding. We have long recognized this court's power to void contracts for violations of public policy. *Shepard v. Farmers Ins. Co. Inc.,* 678 P.2d 250, 251 (Okla.1983); *Dayton Hudson Corp. v. Amer. Mutual Liab. Ins. Co.,* 621 P.2d 1155, 1160 (Okla. 1980); *Telex Corp. v. Hamilton,* 576 P.2d 767, 769 (Okla.1978); *Johnston v. J.R. Watkins Co.,* 157 P.2d 755, 757 (Okla.1945); *Enid Right of Way & Townsite Co. v. Lile,* 15 Okl. 317, 15 Okl. 328, 82 P. 810, 811 (1905). We continue to agree that such power cannot be used lightly as "[c]ontract right[s] constitute no small part of the liberty of a citizen." *Dayton,* 621 P.2d at 1160.

We must remain mindful that contracts should not be declared void on the ground of public policy except in those cases that are free from doubt. Prejudice to the public interest must hence be clearly apparent before a court is justified in pronouncing a solemn agreement to be of no effect ... Contracts must stand unless it clearly appears that pub-

lic right or public weal is contravened. *Id.*

■ Keeping in mind that the procedural posture of this case requires us to determine whether any factual disputes remain, the question of whether a particular agreement is contrary to public policy is ordinarily a question of law. *See Steele v. Drummond,* 275 U.S. 199, 204–5, 48 S.Ct. 53, 54, 72 L.Ed. 238 (1927); *Bovard v. Amer. Horse Enter.,* 201 Cal.App.3d 832, 247 Cal. Rptr. 340, 343 (1988). "The relevant principle is well established: a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Town of Newton v. Rumery,* 480 U.S. 386, 392, 107 S.Ct. 1187, 1192, 94 L.Ed.2d 405 (1986). No fixed legal rules can determine what is public policy for all time, as public policy necessarily fluctuates with changing economics, social values and morals. "Public policy, like society, is continually evolving and those entrusted with its implementation must respond to its everchanging demands." *McCall v. Frampton,* 99 Misc.2d 159, 415 N.Y.S.2d 752, 758 (N.Y.Sup.Ct.1979).

■ Public policy becomes extremely important when considering agreements involving public service corporations. In *Enid Right of Way,* this Court refused to uphold an agreement which influenced and restricted the discharge of the duty owed by railroad officials to the public. Because a railroad was a quasi-public corporation, the railroad officials were required to consider the needs and conveniences of the public. When deciding on location of depots, railroad officials were required to place the depots where they best accommodated public needs.

With the public policy as expressed in 79 Okl.Stat.1981 § 4 in mind, we now turn to the contract provision in question, and the facts surrounding it. Although Western disputes the fact, the contract states that Western was unable to meet all the power needs of Canadian, and that Canadian should continue to obtain power from the SPA. Canadian also agreed to pay Western the difference between the amount charged by the SPA and the amount which would have been charged by Western. In the stipulations, the parties agree that Canadian paid in excess of four million dollars to Western during the time period between January 1974 and November 1977. These facts alone, however, do not indicate unlawfully discriminatory practices.

The question of whether this contract provision arbitrarily discriminated against Ratepayers will turn on facts not disclosed by the present record. It is stipulated that Canadian was a member of Western, as were several other rural cooperatives. The parties have also stipulated as to the amounts charged by Western and paid by Canadian. However, the question of discrimination requires inquiry into the way the rates charged to members of Western increased during the period in question. It is alleged that such rate increases were solely tied to increases in Western's cost of delivering electricity, none of which was delivered to the Canadian customers. This information is essential to determine whether all members of Western, including the plaintiffs, were "similarly situated". It is also relevant to Ratepayers' assertion that the extra four million dollars they paid was merely a way of subsidizing other Western members.

Western claims that expenditures had to be made to facilitate the commencement of the supply of power to Canadian. The record is not clear as to what these expenditures cost, or were for, or whether any of the plaintiffs' payments made to Western during the initial period of the contract, January 1, 1974 through November 30, 1977, were to defray these "start-up" expenditures. These are also fact questions which cannot be settled on summary judgment.

Clearly, summary judgment as to this theory of recovery was premature in light of the many remaining factual questions. Although the question of public policy is generally determined by the court as a question of law, the incomplete record in this case demands further factual findings. While we agree that public policy demands non-discriminatory treatment by public

**60**

businesses to their customers, we are unable to determine whether unlawful discrimination has here occurred. We do believe that Ratepayers have shown sufficient controversy so as to allow their claims on this theory to be submitted to a trier of fact. This part of Plaintiff's case is remanded to the trial court for further proceedings.

■ If this provision is determined to be unlawfully discriminatory, and therefore unenforceable, the trial court must then determine whether the remaining parts of the contract are also unenforceable. *Restatement (Second) of Contracts* § 184 (1981). The enforceability of the remaining portions is dependent upon the expectations of the parties. If the invalid contractual provision is an essential part of the agreement and the parties would not have agreed absent that provision, then the entire contract is unenforceable. *Id.; Zerbetz v. Alaska Energy Center*, 708 P.2d 1270, 1282 (Alaska 1985). However, if the discriminatory and hence unenforceable provision is not considered essential, the offending provision will be excised and the remaining portions of the contract will be enforced. *Id.*

Additionally, should the trial court determine the provisions complained of to be unlawfully discriminatory it shall determine the amounts refundable to the aggrieved Ratepayer plaintiffs, and provide a method for accomplishing the refunds of such sums as are due.

### CONCLUSION

Summary adjudication was proper as to the theories alleging lack of consideration, and that portion of the trial court's Order is affirmed. However, summary judgment was improper as to the allegations of breach of the Trustees' fiduciary duty, as well as of unlawful discrimination based on violation of public policy. Several factual disputes remain. Those portions of the trial court's Order are reversed, and the cause is remanded to the District Court for further proceedings consistent with our ruling.

HODGES, LAVENDER, SIMMS, ALMA WILSON, and KAUGER, JJ., concur.

OPALA, V.C.J., concurs in part, dissents in part.

HARGRAVE, C.J., and DOOLIN, J., disqualified.