2006 OK CIV APP 145

Michael SHOLER, et al., for themselves and all others similarly situated, Plaintiffs/Class Representatives,

v.

STATE of Oklahoma ex rel. DEPARTMENT OF PUBLIC SAFETY, David R. McBride, Commissioner, Defendant.

The Richardson Firm, P.C., a Professional Corporation d/b/a Richardson & Ward, Plaintiff/Appellant/Counter–Appellee,

v.

Carpenter & Laquer, a Partnership; Bob G. Carpenter, Richard D. Laquer, and Bill Stout, individuals, Defendants/Appellees/Counter–Appellants.

No. 100311.

Court of Civil Appeals of Oklahoma, Division No. 4.

Feb. 28, 2006.

As Corrected March 8, 2006.

Rehearing Denied Aug. 18, 2006.

Certiorari Denied Nov. 20, 2006.

Keith A. Ward, E. Diane Hinkle, Richardson, Stoops, Richardson & Ward, Tulsa, Oklahoma, for Appellants/Counter–Appellees.

1. Many of the background facts set forth in this section were taken from *Johnson v. State ex rel. Department of Public Safety*, 2000 OK 7, 2 P.3d 334 (*Johnson*) and *Sholer v. State ex rel. Department of Public Safety*, 1999 OK CIV APP 100, 990 P.2d 294 (*Sholer II*).

2. On remand, the district court (1) certified a class (Class A) consisting of individuals who had paid multiple reinstatement fees and additional fees after July 6, 1990, and before July 8, 1993;

Bob G. Carpenter, Richard D. Laquer, Carpenter & Laquer, Oklahoma City, Oklahoma, for Appellees/Counter–Appellants.

DOUG GABBARD II, Presiding Judge.

¶1 Appellant, The Richardson Firm, P.C. (Richardson), appeals from a trial court judgment finding unenforceable its fee-sharing contract with Appellees, Carpenter & Laquer, a partnership, Bob G. Carpenter, Richard D. Laquer, and Bill Stout (collectively, Carpenter). Carpenter counter-appeals from the trial court's judgment denying its motion for sanctions against Richardson. We affirm.

## HISTORICAL AND PROCEDURAL BACKGROUND[1]

¶2 This is an ancillary proceeding to a long-pending class action against the Oklahoma Department of Public Safety (DPS). In July 1993, Carpenter initiated class action litigation on behalf of Plaintiffs Michael Sholer, Wanda Johnson, and others seeking recovery of driver's license reinstatement fees charged by DPS in excess of its authority. On appeal, in *Sholer v. State ex rel. Department of Public Safety*, 1995 OK 150, 945 P.2d 469 (*Sholer I*), the Oklahoma Supreme Court held that DPS had improperly charged multiple reinstatement fees for drivers who received more than one suspension and that this decision applied retrospectively, subject to a three-year statute of limitations. The Supreme Court then remanded the case to the trial court to determine the issue of class certification. On remand, the trial court entered an order of certification and the case was again appealed.[2] In March 1999, the Oklahoma Court of Civil Appeals settled the issue of class certification in *Sholer v. State ex rel. Department of Public Safety*, 1999 OK CIV APP 100, 990 P.2d 294 (*Sholer II*).[3]

(2) refused to certify a class (Class B) consisting of individuals who had paid multiple reinstatement fees and additional fees or the incorrect additional fee after July 7, 1993; and (3) awarded costs to Sholer as the prevailing party.

3. The Court of Civil Appeals affirmed the certification of Class A, reversed the denial of certification of Class B, and affirmed the award of costs.

DPS then sought a writ of certiorari with the Oklahoma Supreme Court.

¶ 3 Shortly after remand in *Sholer I*, Plaintiff Johnson opted out of the class and filed an individual suit. That case resulted in a judgment for *Johnson* which was not appealed by DPS. However, when DPS refused to pay, claiming that the judgment for a refund was extinguished by merger, and that, in any event, it was not authorized to pay the judgment without an appropriation, Johnson filed a petition for writ of mandamus. The trial court denied the writ and Johnson appealed.

¶ 4 In June 1999, while both *Sholer II* and *Johnson* were pending in the Oklahoma appellate court system, Carpenter, the law firm representing Plaintiffs in both cases, grew impatient with the six-year-old litigation and began to consider alternative methods of concluding it. Al Kamas, an Oklahoma attorney and Bob Carpenter's uncle, testified Bob Carpenter and Richard Laquer believed that DPS was continuing an unreasonable, obstructionist approach which impeded settlement discussions, prolonged litigation, and cost taxpayer money. Bob Carpenter also had a serious illness causing him to desire a quick resolution in the case. According to Laquer, Kamas advised the parties to obtain political help in settling the lawsuit, and that "there was only one firm in Oklahoma that had entre to the governor to get this case settled, and that was Gary Richardson's firm in Tulsa." Laquer testified that the attorneys decided to contact Richardson to see if it had "sit-down power with the people who could make a decision to stop the litigation."

¶ 5 Representatives of the two firms met. Shortly after the meeting, on June 22, 1999, Carpenter sent Richardson a signed memorandum agreement. The agreement recited that Richardson would participate in the litigation "by making every effort to get these cases concluded by negotiated settlement on a basis satisfactory to your firm, our firm, the clients and to the court," and that if the litigation was resolved by court-approved settlement, Richardson would receive 20 percent of the net attorney fees as well as any expenses advanced. Carpenter would remain "primarily responsible for handling all legal matters in bringing this litigation to a successful conclusion in the absence of settlement," and Richardson would not enter an appearance in the litigation until an entry of appearance was necessary for the matter to proceed to settlement. The letter also provided:

It is understood that your firm will take the lead and will be responsible for implementing any and all strategy in bringing about a negotiated settlement of these matters. All firms will participate in whatever activities your firm requests in connection with bringing this matter to a negotiated settlement. It is expressly understood that in the event this matter is not concluded by negotiated settlement within one year from the date of this letter, it will become necessary for our firms to evaluate the continued efforts so as to determine whether this agreement should be terminated on that date or whether it should be extended so as to permit your firm to continue its efforts to bring this matter to a negotiated settlement. It is further understood that in the event your activities demonstrate meaningful and continuing negotiations on the anniversary date, this contract will remain in force until such time as those activities are not indicating any promise of success.

¶ 6 Richardson returned the signed agreement on August 6, 1999, with two handwritten, initialed changes: (1) that Richardson *would* (rather than *would not*) enter an appearance in the litigation; and (2) that Richardson would be paid upon a court-approved settlement or "any other satisfactory resolution" which, Richardson explained in an accompanying cover letter, applied if it should "negotiate a bill that pays this obligation, or arrange acceptable payment of a judgment." Although Carpenter did not initial these changes, Laquer testified that the June 22 letter with the August 6 interlineations represented the parties' agreement.

¶ 7 Both firms clearly understood that the primary purpose of the agreement was to obtain a negotiated settlement using Richardson's political influence with the governor. Keith Ward testified that his firm was specifically hired to get "the executive branch ... to sit down at the table." Gary Richardson testified the firm was to "inform some of the leaders of the state as to what some of their

underlings maybe were doing that was creating additional expense for the taxpayers" and to "make contact with the Governor's Office and any other contact that I might be able to make to maybe influence a change in attitude. . . ."

¶ 8 Shortly after the August 6 agreement, Gary Richardson and Keith Ward had dinner with their former law partner, Governor Frank Keating, primarily, according to their testimony, to discuss the DPS litigation. Keating advised them to contact his general counsel, Duchess Bartmess, outlining their concerns by letter. However, during the next few weeks, Richardson took no further documented action.

¶ 9 On October 5, 1999, the Oklahoma Supreme Court denied DPS's petition for certiorari in *Sholer II,* leaving intact the Court of Civil Appeal's decision granting certification to both classes and costs to the Plaintiffs. On October 25, surprised by the Supreme Court's quick decision, Carpenter wrote Richardson, noting that the major issues in the litigation had now been resolved, and stating that:

> Our agreement dated June 22 and August 6, 1999, contained a division of labor, with your firm trying to negotiate a settlement, while our firm continued the litigation. Given that the litigation has succeeded, if you intend to further participate, we need another meeting to determine our roles. Please contact us before the end of next week to arrange a meeting. If we don't hear from you, we will assume that you have no interest in continuing in this matter.

*Sholer II* become final on November 4, 1999. However, *Johnson* remained on appeal.

¶ 10 Following receipt of the letter, representatives of the two firms met again. Afterwards, on November 9, Carpenter sent another letter to Richardson to "confirm the terms of the substitute agreement between our firms." That letter indicated that Richardson would "use its best efforts to settle the conflict over the source of the payments to our class members, on appeal in *Johnson v. Ricks*" and that its contacts would be limited to the Governor's Office and DPS, with Carpenter responsible for contacts with the Attorney General. To accomplish this

settlement, Richardson would be authorized to negotiate all of the administrative details that they had discussed, with Carpenter reserving the right to accept or reject any settlement. If a settlement authorized use of the DPS clearing account, then Richardson would receive ten percent of the attorney fees awarded; if settlement was funded by the Contingency Review Board, then Richardson would receive five percent of the attorney fees awarded.

¶ 11 Richardson did not immediately respond to Carpenter's letter containing the amended agreement, but, on the same date, sent entries of appearance requesting Carpenter to file them in each case. The entries of appearance were filed, but never approved by the trial court. Richardson took no other documented action in the matters until January 2000, when it finally wrote the letter to Bartmess which Governor Keating had requested the previous August.

¶ 12 On February 1, 2000, before Bartmess responded to the Richardson letter, the Oklahoma Supreme Court in *Johnson v. State ex rel. Department of Public Safety,* 2000 OK 7, 2 P.3d 334 (*Johnson*), reversed the trial court and issued a writ of mandamus to DPS, holding that the refund judgment was not extinguished by merger, and that such judgments could be paid without additional appropriations from DPS's clearing account.

¶ 13 On February 9, Laquer called the Richardson firm to again discuss their relationship. Richardson indicated it had received the November 9 letter, and considered it an unacceptable proposal. Richardson further stated that the August 6 agreement was still in effect, and that it intended to continue its work and be paid in accordance with the original agreement.

¶ 14 On or about February 16, Richardson scheduled a settlement conference in *Sholer* and *Johnson* with representatives of its firm, DPS, the Attorney General, and Carpenter. Carpenter responded by letter to Richardson that a settlement conference was not necessary and was not authorized. In its letter, Carpenter noted that Richardson had claimed that it could "cut through the political barriers in the governor's office and at the DPS that had kept us in litigation for six

years," that it had not done so, and that "there is nothing left that you can settle for us" since both *Sholer II* and *Johnson* had been resolved. Without responding to Carpenter's letter, Richardson, on February 23, mailed out notice of a March 3 settlement conference. A few days later, Laquer notified the Attorney General that Richardson was not authorized to represent the Plaintiffs.

¶ 15 During the next month, Carpenter negotiated the terms of administrative orders requiring DPS to pay refund claims to the Plaintiffs, the total refund, and the attorney fees. This settlement was approved by the court and filed on April 6, 2000. Richardson filed this ancillary proceeding in August 2000. Carpenter answered that Richardson had not complied with the terms of the agreement.

¶ 16 The trial of this proceeding was held in March 2003. At that point, Carpenter had been paid more than $3,937,000 in attorney fees (20 percent of which would be more than $787,400). At the conclusion of the trial, the court issued an order finding "the contract entered into ... dated June 22, 1999, is void because it is a contract with an unlawful object to employ a lobbyist on a contingency fee in violation of 21 O.S. § 334 and 74 O.S. § 4249." It denied Richardson's requested relief. It also denied Carpenter's motion seeking sanctions against Richardson for waiting until March 21, 2003, to subpoena documents for the March 24 trial, relating to attorney fees paid to Carpenter.

¶ 17 Richardson appeals, arguing (1) the trial court denial of its breach of contract claim was based upon an incorrect interpretation of 21 O.S.2001 § 334 and 74 O.S.2001 § 4249; (2) the parties' agreement was unambiguous and the trial court's admission of parol evidence of the parties' intent was reversible error; and (3) even if the contract is unenforceable, Richardson was entitled to recovery on equitable principles. In a counterappeal, Carpenter contends the trial court abused its discretion by denying Carpenter's request for sanctions.

## STANDARD OF REVIEW

■ ¶ 18 The issue of whether a contract should be deemed void as a violation of public policy presents a question of law. *Hu-*

*ber v. Culp,* 1915 OK 366, ¶ 3, 149 P. 216, 218. Statutory construction also presents an issue of law. *Arrow Tool & Gauge v. Mead,* 2000 OK 86, ¶ 6, 16 P.3d 1120, 1123. Questions of law are reviewed de novo, subject to an appellate court's "plenary, independent and nondeferential reexamination." *Fine Airport Parking, Inc. v. City of Tulsa,* 2003 OK 27, ¶ 7, 71 P.3d 5, 9.

## ANALYSIS

### 1. Legality of the Agreement

■ ¶ 19 The First Amendment to the United States Constitution and Article 2, § 3 of the Oklahoma Constitution protect the right of private individuals to petition or "lobby" their government officials. Accordingly, contracts with a primary purpose of influencing executive or administrative officers are not presumptively illegal. However, lobbying contracts which contemplate the use of personal influence and solicitation, rather than appealing to the merits of the issue, are often viewed as contrary to public policy and void. *See* 17A Am.Jur.2d *Contracts* § 283 (1991). So, too, are lobbying contracts in which the fee is contingent upon success.

■ ¶ 20 The first issue raised by the briefs is whether the primary purpose of the Richardson contract was for lobbying. In that regard, the Oklahoma Legislature has defined a lobbyist as one who has been employed for financial or other compensation primarily to communicate with either the governor or members of the legislature, the Corporation Commission, or the judiciary on behalf of a "lobbyist principal" for the "passage, defeat, formulation, modification, interpretation, amendment, adoption, approval or veto of any legislation, rule, regulation, executive order or any other program, policy or position of the state government ..." 74 O.S.2001 § 4249 (1). Lawyers are not excluded from these provisions *unless* they are either acting in their professional capacities as attorneys and have entered their appearance in a court case or quasi-judicial proceeding, or their lobbying activities are only incidental to and not a significant part of the services provided to the client. 74 O.S.2001 §§ 4249 (1) & (2).

¶ 21 In this case, the primary objective, and most significant purpose, of the contract was the use of Richardson's personal influence to procure "official action" by an executive of state government that would settle significant litigation with a state agency.[4] The parties agree that Richardson was retained to use, and, in fact, attempted to use, his personal influence with his former law partner, Governor Frank Keating, to negotiate a settlement of the cases. Moreover, the statutory exceptions are not applicable: Richardson was not primarily employed to use its professional legal skills, but to use its personal influence with a state official who was not involved in the litigation. The firm did not enter its appearance in the litigation until after its contact with the governor, and its entry of appearance was never approved by the trial court. Moreover, Richardson's use of its political influence to settle the litigation was the primary objective of the contract, and was not merely incidental to it. Therefore, the contract in question was clearly a lobbying contract.[5]

■■■■■ ¶ 22 The next issue presented is whether a lobbying contract for a contingent fee is enforceable. In making this determination, we note that most contingent fee lobbying contracts in this state are unlawful.[6] 21 O.S.2001 § 334. Making the payment of a lobbying contract contingent upon success is generally contrary to public policy because it increases the potential for abuse in public decision-making.

¶ 23 This principle is even more important in regulating the conduct of attorneys because of their importance and influence in governmental decision-making. In *Chambers v. Coates*, 1936 OK 143, 55 P.2d 986, for example, the Supreme Court invalidated, on public policy grounds, a contract where the attorney's fee was contingent upon the attorney procuring a change in a city ordinance. The Court held that the contract was contrary to public policy and void, not because "corruption and wrongdoing and undue influence would be the certain result thereof, but on account of the . . . corrupting tendencies of such contracts" when matters of significant public interest are at stake. *Id.* at ¶ 12, 55 P.2d at 989. *See also Hughes v. Woodard,* 1937 OK 662, ¶ 10, 77 P.2d 685, 686, where the Court found "no grounds for disagreement with" the holding that "a contract whereby a lawyer is to receive a contingent fee, based upon doing some act in regard to controlling the course of government, is void and against public policy."

■■■■■ ¶ 24 When a *portion* of an agreement violates public policy and is unenforceable, the remainder is not always precluded from enforcement. "The enforceability of the remaining portions is dependent upon the expectations of the parties. If the invalid contractual provision is an essential part of the agreement and the parties would not have agreed absent that provision, then the entire contract is unenforceable." *Hargrave v. Canadian Valley Elec. Co-op., Inc.*, 1990 OK 43, ¶ 36, 792 P.2d 50, 60. "However, if the discriminatory and hence unenforceable provision is not considered essential, the offending provision will be excised and the remaining portions of the contract will be enforced." Id. Thus, while a court will not enforce the illegal provisions of a contract, it may enforce other portions if the contract as

---

4. Richardson also argues that Bob Carpenter and Richard Laquer do not meet the definition of "lobbyist principal" because the statutory definition excludes individual members, partners, officers or shareholders of a "firm." It is undisputed, however, that the June 22, 1999, agreement was with Carpenter & Laquer, a partnership, or "firm." The fact that the partnership is made up of individuals does not make the statutory definition less applicable.

5. In this regard, we note that both parties agree that the "Substitute Agreement" proposed by Carpenter after the *Sholer II* decision was never accepted by Richardson.

6. Richardson argues that the trial court erred in finding a violation of 21 O.S.2001 § 334, since it was not hired to obtain the "passage or defeat of any official action or the approval or veto of any legislation, issuance of an executive order or approval or denial of a pardon or parole by the Governor." Richardson argues that, by its plain language, the statute only applies to political influence used to pass or defeat a law, executive order, or administrative order or policy, not to litigation. Because we hold that the Richardson contract is unenforceable on public policy grounds, it is unnecessary to address the merits of this argument. We have only cited the statute to demonstrate the State's general public policy against contingent fee lobbying contracts.

a whole has not been rendered totally ineffectual by the illegal portion.

¶ 25 In this case, because the primary purpose of the contract was to effect a negotiated settlement by lobbying, and the parties would not have entered into the contract without it, the agreement is void in toto. Although the parties later discussed another relationship, there was never a meeting of the minds. Richardson continued to insist on enforcement of the August 6 contract, and to reject Carpenter's offer of alternate terms.

¶ 26 Accordingly, the trial court's decision that this was a contingent fee lobbying contract, and that such contracts are in violation of public policy, void, and unenforceable, is affirmed.[7]

## 2. Admission of Parol Evidence

¶ 27 Richardson also claims the trial court committed reversible error in admitting parol evidence. It claims that evidence of the parties' intent was irrelevant and should not have been admitted, because the contract itself was "unambiguous" as to both its terms and the parties' intent. We disagree.

¶ 28 Both parties found it necessary to present evidence explaining their agreement because the contract terms were not clear. Richardson's case-in-chief relied in large part on eliciting testimony from its own witnesses describing the events that led Carpenter to Richardson in the first place, and the various attorneys' understanding of their respective duties under the agreement. Because the information concerning Richardson's political influence was not set forth in detail in the parties' agreement, Richardson raised and relied on such evidence at trial.

¶ 29 Moreover, by raising and relying on this evidence in its case in chief, Richardson waived any alleged error. A party who invites error in the introduction of evidence cannot later be heard to complain about its admission. See *Plains Petroleum Corp. v. Hatcher*, 1936 OK 376, ¶ 9, 57 P.2d 599, 600–01; *Republic Nat'l Life Ins. Co. v. Chilcoat*, 1961 OK 254, ¶ 19, 368 P.2d 821, 826. We reject Richardson's proposition of error on this issue.

## 3. Richardson Is Not Entitled to Share in Recovery on Equitable Principles

¶ 30 Richardson also contends that even if the fee-sharing contract is unenforceable as written, the firm should nonetheless be compensated under joint venture principles or for other equitable reasons.

¶ 31 A joint venture may be found to exist where attorneys have agreed to share fees. The essential criteria for ascertaining the existence of a joint venture relationship are: (1) joint interest in property, (2) an express or implied agreement to share profits and losses of the venture, and (3) action or conduct showing cooperation in the project. The contributions of the respective parties need not be equal or of the same character for the relationship to be a joint venture, but there must be some contribution of each co-adventurer of something promotive of the enterprise. *Lapkin v. Garland Bloodworth, Inc.*, 2001 OK CIV APP 29, ¶ 10, 23 P.3d 958, 962.

¶ 32 In this case, Carpenter and Richardson embarked upon a venture to settle the litigation by using political influence.

7. Carpenter argues the contract with Richardson may not be enforced because it violates Rule 1.5(e) of Oklahoma's Rules of Professional Conduct, 5 O.S.2001 ch. 1 app. 3–A, concerning requirements of fee-sharing contracts among lawyers. Though the record does not reflect that Rule 1.5(e)'s requirements were met, the Oklahoma Supreme Court has indicated its reluctance to allow the use of the Rules of Professional Conduct to form the basis of a claim or defense in civil litigation. See, e.g., *Oklahoma Turnpike Authority v. Horn*, 1993 OK 123, 861 P.2d 304, where the Court, relying on the comments to the Rules, held that a violation of Rule 1.5(e) should not give rise to a cause of action or create a presumption that a legal duty has been breached. *Horn* held that the failure of a property owner's counsel to comply with Rule 1.5(e) in a fee-splitting agreement could not be used by the Turnpike Authority to bar recovery of attorney fees to which the owner was statutorily entitled. Courts in other jurisdictions have refused to enforce fee-splitting agreements that violate Rule 1.5(e), particularly when certain other factors are present; a thorough discussion of these cases is found in *Post v. Bregman*, 349 Md. 142, 707 A.2d 806 (1998). Because we hold the letter agreement in the instant action is unenforceable on other grounds, however, we do not address this issue here.

If the contingent fee provision is invalidated, Richardson would be entitled to a reasonable fee for any hours that were expended in the successful settlement of the case. However, Richardson's settlement efforts were unproductive. When the *Johnson* decision was issued in February 2000, the primary issues in the case subject to settlement had been determined: DPS had improperly collected fees; it was required to pay refunds and would be subject to writ if it failed to do so; the classes entitled to refunds and the amount of each refund had been determined; and the fund from which the refund could be paid had been identified. The only issues left to be determined were calculating the total amount of the award using DPS computer records and calculating the amount of attorney fees. Richardson's attempt to involve itself in the litigation by scheduling a settlement conference was not authorized by Carpenter or the terms of the August contract. Because its efforts to settle the litigation by political means were unsuccessful and its litigation work was unauthorized, it is not entitled to any of the profits under a theory of joint venture.

 ¶ 33 Richardson is also not entitled to recover under a theory of quantum meruit. Generally, quantum meruit is applied where a plaintiff renders valuable services benefitting a defendant under circumstances where the defendant was reasonably notified the plaintiff expected to be paid or where it would be unjust for the defendant to retain the benefit without paying. 66 Am. Jur.2d Restitution and Implied Contracts §§ 38 & 81 (2001); *Martin v. Buckman,* 1994 OK CIV APP 89, 883 P.2d 185. Carpenter argues that Richardson did not provide valuable services because its efforts were unsuccessful. Assuming arguendo that Richardson gave valuable services, however, we note that it totally failed to present evidence regarding the hours it expended or the reasonable value of its services.

### 4. Carpenter's Request for Sanctions

 ¶ 34 After reviewing the record, we find no abuse of discretion in the trial court's decision denying sanctions against Richardson for issuing a subpoena to produce documents three days prior to trial.

## CONCLUSION

¶ 35 Based on the evidence and law, we find that the parties' contract was void and unenforceable as a matter of law, that parol evidence was properly admitted to prove the terms of the contract, and that Richardson is not entitled to share in attorney fees on equitable grounds. Carpenter's request for sanctions is denied. Accordingly, the trial court judgment is AFFIRMED.

RAPP, V.C.J., and REIF, J., concur.