C. Rabon MARTIN, Attorney of Record for Plaintiff, Appellant,

v.

Steven V. BUCKMAN, Attorney Lien Claimant, Appellee.

No. 78523.

Court of Appeals of Oklahoma, Division No. 4.

June 7, 1994.

Rehearing Denied July 5, 1994.

Certiorari Denied Oct. 4, 1994.

C. Rabon Martin, Martin & Associates, Tulsa, for appellant.

Loyal J. Roach, Tulsa, for appellee.

1. Emphasis added.

BRIGHTMIRE, Chief Judge.

The order under attack is one in which the trial court sought to equitably divide an attorney's fee fund generated by the professional services of two lawyers pursuant to two contingent fee contracts, the first one being with the appellee attorney who was discharged by the client without cause. The principal complaint of the appealing successor attorney is that the trial court awarded the discharged attorney too much of the fee fund—an award which is said to be clearly against the weight of the evidence, at least in part. The discharged attorney cross appeals complaining that the trial court erred in denying his motion for an attorney's fee award as the prevailing party.

The trial court's order, both as to the award and the denial of the appellee's motion for an attorney's fee, is affirmed.

## I

The operative facts are these. Shortly before midnight on December 4, 1986, Sally J. McDaniel was driving her brother's car westward on South 71st Street in Tulsa, Oklahoma. At one point she came to a hill and, as she approached the crest, an eastbound Tulsa Police car engaged in the high-speed pursuit of a stolen vehicle suddenly appeared in her lane and crashed head-on into her, demolishing the cars, and seriously injuring her.

McDaniel's brother, Ted Burke, also a Tulsa police officer, contacted his attorney, Steven V. Buckman, about representing both Burke and McDaniel. Burke and attorney Buckman negotiated a contingent fee contract whereby attorney Buckman would represent McDaniel with regard to her claim for personal injuries against "the City of Tulsa, *all available insurance carriers,*"[1] and the police officer. For his efforts, Buckman was to receive "33 percent of any settlement that was reached without trial. . . ." McDaniel executed the contract in the hospital December 8, 1986. Attorney Buckman also agreed to represent Burke and his wife, Olga, in their claim for property damage as owners of

the vehicle McDaniel was driving when she was injured.

Attorney Buckman, who had been practicing law a little over two years, began researching the law and otherwise investigating various theories of recovery and sources of liability insurance in an effort "to circumvent the $100,000.00 limit of the political subdivision." Such efforts included the exploration of an action under 42 U.S.C. § 1983, alleging the City's hot-pursuit policy violated McDaniel's civil rights, or a manufacturer's products liability action assailing the car's crashworthiness. He rejected both theories after doing substantial research and finding that the weight of authority was, as he put it, "squarely opposed to treating a high-speed pursuit as a [§] 1983 action." He also reached a conclusion that it was not feasible "to try to hold General Motors responsibile [sic] for two vehicles colliding at approximately 90 miles per hour. . . ."

In January 1987, Buckman timely filed notice of McDaniel's claim with the City in compliance with the Governmental Tort Claims Act,[2] and began efforts to establish the existence of uninsured motorist coverage. First, however, he had to determine which of two automobile insurance policies held by the Burkes covered the wrecked vehicle. This, he said, was not as easy as it might seem because the Burkes owned several vehicles covered by two different carriers, and neither carrier had been advised of the Burkes' recent purchase of the automobile involved in the crash. And to make matters even worse, the Burkes were unable to produce either a title establishing their ownership of the car or, initially, a copy of an insurance verification form. The insurers therefore denied liability.

McDaniel's tort claim was "deemed denied" by the City and attorney Buckman filed a lawsuit on behalf of McDaniel and the Burkes on June 4, 1987, naming the City of Tulsa, the Tulsa Police Department and the two UM insurers as defendants. Attorney Buckman perfected an attorney's charging lien by signing his name on the face of the petition along with the words "attorney's lien claimed."[3]

Following this, one of the insurers sought dismissal on the ground that the "Plaintiffs wholly fail to allege that this Defendant had an insurance policy with the Plaintiffs." The City also sought dismissal of the petition because it failed to recite certain jurisdictional prerequisites regarding prior compliance with the tort claims act, and because it named a "legal non-entity, to wit: the Tulsa Police Department." On July 8, 1987, the police department was dismissed and the amended petition was endorsed "attorney's lien claimed."

Attorney Buckman proceeded with discovery in an effort to garner and preserve all available evidence.[4] Depositions were taken, interrogatories were served, and documents were exchanged.

By August 1987, attorney Buckman said discovery was nearly complete when the City offered to settle McDaniel's personal injury claim for $80,000.[5] Attorney Buckman advised McDaniel not to accept the offer because settling for less than the City's $100,000 maximum liability could jeopardize recovery of any uninsured motorist benefits.

By early fall, attorney Buckman said he was able to get an oral offer of $90,000 from

---

2. Title 51 O.S.1991 and Supp.1993 §§ 151 through 172.

3. This complies with the requirements set out in 5 O.S.1991 § 6.

4. Buckman's efforts included photographing the accident scene and the victim, issuing a subpoena to obtain television footage of the scene, obtaining a transcript of the police dispatcher, maintaining contact with McDaniel's doctors, and engaging in correspondence with the insurers.

5. At the time of the accident McDaniel had a blood-alcohol content of .06 and, although there is no contention that her impaired state in any way contributed to the accident, there was speculation at the attorney's fee trial that the City's initial offer to settle for less than the $100,000 limit of its liability may have been a result of that fact. Buckman said McDaniel's condition at the time of the accident "certainly" influenced his assessment of the case but it was "merely a stumbling block to overcome with the City as far as comparative negligence is concerned."

the City's attorney.[6] He again advised his client to reject the offer and explained that:

"There were still at least another [$]50,000 in uninsured motorist coverage and, at that point, the second policy of [$]50,000 was looking shakier all the time. But it was still possible we have another hundred thousand dollars in coverage and it just wasn't worth giving it up with her current injuries and damages."

He further stated that he kept after the City to increase its settlement offer so that he could enter into serious negotiations with the UM carriers and perhaps lay the predicate for a bad-faith claim in which punitive damages could be sought. This approach, he had been told by an attorney who had used it, had been successful in a recent federal district court case in which the insured recovered punitive damages based on an insurer's willful refusal to enter into good-faith settlement negotiations when it was "clearly shown from the damages and liability that they should pay the claim."

Then, during her deposition, Olga Burke produced an insurance verification form which identified the appropriate UM carrier. Thus, attorney Buckman was able to determine the limits of liability and advise McDaniel that it appeared the total recovery would be limited to $100,000 from the City and $50,000 from the one UM carrier.

In the meantime, a boyfriend of McDaniel's told her about another attorney and sent her to talk to him. She did, and he told her he thought a § 1983 civil rights claim was viable and, if so, "the [$]100,000 limit would not apply if you could win a civil rights action against the City[.]" As for the potential recovery, she recalled he said "something about the [$]500,000."

On December 21, 1987, a letter from McDaniel was hand delivered to attorney Buckman at his office. In it, McDaniel informed him:

"I have decided to discharge you as my attorney and transfer responsibility for my claims arising from the December 4, 1986, automobile accident to

[the other attorney's name and address].

"Please make my files and records available to [him] at his convenience.

"Also, please provide [him] with an itemization of any expenses you have incurred to date and a detailed listing of your time expended on various activities in the case.

"Thank you for your prompt attention to this matter."

Attorney Buckman said after he received the letter, he "spent about half a day just sitting at my desk staring at the letter trying to figure out why I'd been fired." Indeed, McDaniel said she had never expressed dissatisfaction with his performance, but gradually lost confidence in his ability to handle her claim because "[i]t just seemed like it was taking so long."

On December 23, 1987, attorney Buckman wrote McDaniel a letter expressing his "regret that you have decided to obtain a different attorney rather than allow me to complete this matter" and, because he had "spent a great deal of time in preparing this case and reaching its present position with the City of Tulsa," he had "filed an Attorney's Lien in order to be paid for my fees and expenses." The same day he wrote the City's attorney and the attorney for the UM insurer to confirm the City's settlement offer of $90,000.

The next day, December 24, 1987, attorney Buckman wrote McDaniel's second attorney to inform him that as a result of his, attorney Buckman's, efforts, the case was "all but ready for a Pre-trial Conference and trial" and therefore attorney Buckman's "fee has become fully vested (and earned) in the minimum sum of $30,000.00" plus expenses of $693.92. Attorney Buckman said that at the new attorney's request, they "spent about two hours in my office going through, showing him different pleadings, discussing different things I had done, why I was doing them,

---

**6.** The City's attorney denied such an offer, but Buckman's testimony was corroborated by an attorney for the UM carrier.

and the different theories of recovery that were available."

McDaniel stayed with the second attorney "maybe six months" and then discharged him because he "just seemed real busy."[7] The second attorney referred her to a third attorney, appellant Martin, with whom she entered into a contingent fee contract for representing her in her claim against the City, plus additional legal services. It provided Martin a fee of 40 percent of any recovery made prior to his having to prepare for trial. Attorney Martin filed his entry of appearance in the pending lawsuit as McDaniel's attorney December 8, 1988.

It was over a year later, however, on January 11, 1990, before attorney Martin requested the court to set the matter for trial. Still nothing happened. Then on August 3, 1990, he sought leave to amend McDaniel's cause of action to include "a claim founded under 42 U.S.C. Sec. 1983"—a charge that the City had violated the plaintiff's civil rights.

At this point, the City evidently decided that it would be too expensive to continue withholding its limit and so, on November 28, 1990, it paid the full $100,000 limit of its liability.[8] McDaniel then "abandoned" her civil rights claim, and a journal entry reflecting the settlement was filed November 30, 1990. The UM carrier then tendered its $50,000 check on December 12, 1990, payable jointly to McDaniel, Martin and Buckman.[9]

Attorney Buckman claimed a charging lien right to $49,500, or 33 percent of the total settlement of $150,000 plus expenses. The parties then agreed to deposit $50,693.92[10] in an interest-bearing account pending resolution of the fee dispute.

The matter came on for hearing July 22 and 23, 1991. Both sides presented expert testimony concerning the value and merit of Buckman's legal services and how the fee fund should be allocated between the two attorneys. At the conclusion of the proceedings, the court awarded attorney Buckman a total of $41,519.93—$30,000 under the contingent fee contract and $10,825 for 86.6 hours spent securing UM coverage, and costs. As we mentioned earlier, the court denied attorney Buckman's plea for an attorney's fee as the prevailing party in the ancillary fee allocation proceeding begun by attorney Martin.

Attorney Martin appeals, and attorney Buckman cross appeals.

## II

■ As a preliminary matter, we address attorney Buckman's attack on attorney Martin's first proposition, in which the latter attorney complains about the trial court's denial of his motion for a partial summary judgment limiting attorney Buckman's recovery to $30,000. Buckman contends that such issue is not reviewable because it is not raised in Martin's petition in error.

Attorney Martin's response to Buckman's complaint is that the sixth issue set out in his petition in error—" 'Whether the trial court's determination was, under the evidence, an abuse of discretion' [ ...] necessarily in-

---

7. He is not a party to this action.

8. The City's attorney implicitly admitted that the early refusal to tender the full $100,000 limit was so the City *could* earn interest off of it. He did so by explaining that the $100,000 he tendered to Martin was "essentially the same offer that Mr. Buckman had obtained which was in the amount of $80,000 which at that time it sat at interest for over two and a half years." He explained that "[b]y statute the City pays all judgments from the City's sinking funds. The City's sinking fund is an investment type fund that relates to bonded indebtedness. The surplus in the fund are invested at interest and earn money and our rate of return on surplus at that time was approximately 10 percent." However, it would seem to be more likely that the City simply decided to earn interest off of the money as long as it was profit-

able to do so. After the civil rights allegation was added to the petition the City might very well have concluded that the cost of defending that issue would exceed the earnings off of the $100,000 and therefore decided to tender it.

9. The attorneys have very different impressions of events following receipt of the settlement proceeds and the ultimate timeliness of disbursement of the proceeds to McDaniel. The focus of our analysis is on Buckman's performance *before* he was fired, and therefore such events are irrelevant to the result we reach.

10. The parties apparently overlooked the fact that attorney Buckman's contract was for only 33 percent and therefore agreed to set aside a full one-third of the settlement, namely $50,000.

cludes any issue raised before trial on motion for summary judgment."

Although the assailed proposition comes perilously close to being a forbidden "shotgun" allegation,[11] we conclude, in line with a recent holding of the supreme court, that the "issues briefed are fairly comprised within the assertions of error alleged" in the petition in error, and that attorney Martin's first proposition is thus properly before us for review.[12]

■ With respect to the merits of attorney Martin's first posited error, however, we find none. Summary judgment is proper only where there are no disputed issues of material fact and one party is entitled to judgment as a matter of law. *Flanders v. Crane Co.*, 693 P.2d 602 (Okl.1984). Attorney Buckman's December 24, 1987, letter to the first successor attorney facially discloses no more than a compromise offer to settle his claim for $30,000, plus costs, which we presume represents one-third of the $90,000 offer he had received from the City. The materials attached to attorney Martin's motion for partial summary judgment and attorney Buckman's response clearly demonstrate the same thing. Such evidence of a compromise offer not only does not estop attorney Buckman from offering proof that he is entitled to a greater share of the fee fund but it, of course, would not even be admissible if the case were being tried to a jury.

The trial court's denial of the motion was correct.

**11.** *See* Civil Appellate Procedure Rule 1.16(C), 12 O.S.1991 ch. 15, app. 2.

**12.** *Markwell v. Whinery's Real Estate, Inc.*, 869 P.2d 840, 843 (Okl.1994).

**13.** Martin argues, for instance, that Buckman's total hours were inflated by charging "attorney time," or $125 an hour, for all his time, including tasks Martin says should have been performed by "a para-legal, law student, a clerk, an intern, or an investigator, or a runner." Such an argument is an invitation for the court to invade the prerogatives of an attorney to decide what he should or must do himself and what he should or can delegate to "a para-legal, law student, a clerk, an intern, an investigator, or a runner." Generally speaking, the more time the lawyer spends on a contingent fee case the better off the

### III

Attorney Martin's second attack is that the "court below erred in awarding the discharged attorney full contract fee for securing a worthless offer."

At the outset it should be noted that the trial court did not award attorney Buckman his "full contract fee" which would have been 33 percent of the $150,000 settlement—the contingency event—or $49,500. The award was evidently based on one-third of the $90,000 offer plus some hourly compensation for Buckman's UM coverage work.

Attorney Martin's argument is that even though attorney Buckman properly advised his client to reject the City's offer, he had accomplished very little of benefit to the client because it was necessary to recover the full $100,000, the limit of the City's liability, in order to trigger the insurer's UM liability of $50,000 for a maximum settlement of $150,000. And so, for this reason, Martin opines that attorney Buckman's negotiated offer of less than $100,000 was of no value to McDaniel. At the same time, attorney Martin admits in his brief that the belated settlement eventually reached was obtained without much effort on his part and, therefore, he attributes the eventual settlement to his greater experience and reputation without regard to the prior services of attorney Buckman. To emphasize the "worthlessness" of the $90,000 offer, he chides attorney Buckman for having wasted time and effort in ways which attorney Martin considered either unnecessary or without benefit to the client.[13] This, then, is the premise for attor-

client may be, especially if the extra effort is reflected in a better result. The courts should not penalize young or solo practitioners by requiring of them the same business and overhead practices of some larger and more wealthy law firms. Thus, the issue in this case is not whether attorney Buckman did his own investigating but what results were achieved by what he did. Our answer is that it appears that had he not been discharged he would have likely pushed the case to trial and achieved the $150,000 settlement several months sooner than November 30, 1990. And, with regard to the UM hourly award, as we point out elsewhere, absent the parties' stipulation, we see no basis for valuating the UM work on an hourly basis. The very limited quantum meruit criterion applicable in this case was, or should have been, how to equitably divide $49,-500—the amount attorney Buckman would have

ney Martin's conclusion that it was error to compensate attorney Buckman under the provisions of the contingent fee contract rather than on a so-called "quantum meruit" basis.

We disagree. First of all, the $90,000 offer, being as it was within $10,000 of the City's statutory limit of liability, was not worthless but rather was indicative that considerable progress had been made. Indeed, it might even be considered outstanding when compared to the progress made by attorney Martin during the next thirteen months. For it was over a year before the latter took any positive action, a delay which enabled the City to use the money much longer than it should have been permitted to, all at the expense of the client. Secondly, as we already mentioned, the court did not award attorney Buckman his full contract fee of $49,500. Thirdly, in light of the evidence previously summarized and the law which we are about to review, it would have been difficult to criticize the trial court if it had awarded attorney Buckman the full amount of his contract fee as damages for its breach.[14]

■■■ A review of the relevant law is necessary at this point. To begin with, there is no question about the fact that contingent fee contracts of 50 percent or less are valid and enforceable in this state.[15] In simple terms, a contingent fee contract is one in which a client engages an attorney to represent her in the recovery of, say, a certain sum of money she claims is owed to her, and the attorney agrees to accept for his services a certain percentage of what he recovers either by settlement or by judgment. The statutes provide the means for a lawyer to give notice of and perfect a lien on the proceeds of such recovery.[16] And, an "action to enforce an attorney's lien on proceeds from settlement of client's cause of action is of equitable cognizance and triable to the court without a jury." [17]

■■■ It is also settled that a client has the right to terminate her relationship with her attorney at any time, whether the contract of employment is a contingent one or not. If an attorney is discharged without cause, the lawyer working on a contingent fee basis is entitled to receive for his services a proportionate share of any contingent fee fund eventually created.[18] And, where the discharged attorney has *substantially performed* the terms of the contract, he is entitled to the full contract fee even though the contingency does not take place until after the discharge.[19]

■■■ Relevant also is the fact that an attorney's lien on the proceeds of a settlement is not satisfied by merely depositing the sum of money claimed by the attorney with the court clerk. For the lien attaches to the deposit.[20] In *City of Barnsdall v. Curnutt*,[21] the court had to decide whether the widow of a lawyer who, prior to his death, had substantially prosecuted a tort claim pursuant to a contract which called for the attorney to receive 40 percent of any recovery obtained by either settlement or judgment, from an oil company said to have been polluting the City of Barnsdall's water supply. Following an investigation, the attorney negotiated a ten-

---

more than likely earned had his contract not been terminated.

14. One reason for this is that the evidence shows that attorney Martin upped his pre-trial settlement fee to 40 percent in his contract with Ms. McDaniel, creating a total fee fund of $60,000, thus assuring that he would receive $10,000 regardless of what might be awarded to attorney Buckman.

Of course, the court did not award the latter the full amount of his contract, and attorney Buckman does not complain of the lesser award in his cross appeal. The result is that attorney Martin will receive a fee of about $19,000.

15. Title 5 O.S.1991 § 7.

16. See 5 O.S.1991 § 6.

17. *City of Barnsdall v. Curnutt*, 198 Okl. 3, 174 P.2d 596 (1946); *see also Boulding v. Slick*, 161 Okl. 189, 17 P.2d 391, 392 (1932).

18. *See*, for example, *City of Barnsdall v. Curnutt*, n. 17, supra.; *White v. American Law Book Co.*, 106 Okl. 166, 233 P. 426 (1924); and *Quinette v. Mitschrich*, 109 Okl. 281, 235 P. 530 (1925).

19. *White v. American Law Book Co.*, n. 18, supra.

20. *City of Barnsdall v. Curnutt*, n. 17, supra.

21. *See* n. 17, supra.

tative settlement offer of $25,000, which the city rejected. On September 8, 1941, the attorney filed an action seeking damages of $253,000 and endorsed his name and "Attorney's Lien Claimed" on the petition.

On September 21, 1941, attorney Curnutt died. His widow, who became the administratrix of her late husband's estate, "intervened" in the lawsuit and requested that the city allow her attorneys to complete her husband's contract. She then sent the city a letter claiming that $10,000 was owed for attorney Curnutt's services under the contract. On that same day, the city wrote to the widow advising her that it had hired other counsel, and asked for its case file. The city also denied her fee claim saying it had agreed to pay 30 percent of the recovery to the second attorneys, and that the widow should get only $1,000 because the second counsel had filed an amended petition and had conducted some additional investigation. In May 1943, the city settled the lawsuit for $35,000. The court clerk disbursed $10,500 to the second lawyers, held $10,000 which was to be subject to the court's order, and paid the remainder to the city.

The intervening widow then beseeched the court for an order recognizing her late husband's attorney's lien on the $10,000 and directing the clerk to pay it to her. The trial court heard evidence about the services performed by attorney Curnutt prior to his death, about the $25,000 offer he had received, and about his filing suit and getting ready to try the case when the Grim Reaper cut him down. The court also heard expert testimony of local lawyers to the effect that 40 percent of the $25,000 offer rejected by the city was a reasonable and proper fee. Under these circumstances, the court held that the amount sought by the widow as the fee earned by her husband prior to his death was fair and reasonable.

The city appealed. The high court affirmed saying that when "an attorney employed on a contingent basis dies before a final adjudication or settlement has been had, his estate will be allowed to recover the reasonable value of the services rendered by him upon the subsequent successful termination of the litigation in the client's favor.

■ Attorney Martin cites *First National Bank & Trust Co. v. Bassett*,[22] as authority for his legal theory that the value of Buckman's contribution to the attainment of subject settlement must be measured on an hourly basis.[23] In so doing, it appears that attorney Martin is more or less creating a semantic smoke screen to detract from the central issue, *viz.*, what criteria is the court to use in determining attorney Buckman's equitable portion of the contingent fee fund in question?[24] For, by advocating that the trial court failed to apply the common-law doctrine of quantum meruit, attorney Martin overlooks the fact that it is founded on a Latin phrase meaning, "as much as he deserves," and in law has been defined as "a

---

22. 183 Okl. 592, 83 P.2d 837 (1938).

23. It is interesting to note that attorney Martin apparently declines to value his contribution to the settlement on an hourly basis, perhaps because he admits he did not do very much. Instead, the criteria he emphasizes are his "reputation and experience"—neither of which are explained in any detail.

24. Attorney Martin refers to the fact that the *Bassett* case used the expression "quantum meruit" in resolving the issues it faced, and says therefore "Oklahoma is aligned with an ever-growing number of jurisdictions holding that *quantum meruit* is the sole measure of the terminated attorney's right to pretermination compensation, without regard to fault," and directs our attention to an annotation set out at 92 ALR3d 690 (1979). We disagree that the ALR3d annotation supports such a conclusion. A review of the annotation reveals that the concept "quantum

meruit"—which in a literal sense simply means "as much as he deserves,"—has been applied in a variety of differing senses. Most states use it in the same sense that Oklahoma uses it, namely, to determine what a reasonable fee would be in non-contingent fee contracts of employment. Since this is usually on an hourly-rate basis, it has, as a practical matter, little if any value or applicability in determining an equitable division of a contingent fee fund between a lawyer discharged without cause and one or more successor lawyers. According to the annotation, the invocation of quantum meruit in its purest form is used only in those few states which refuse to enforce breached contingent fee contracts, and since the lawyer can recover no damages for the breach of the contract, the only relief available to him is to be paid on a quantum meruit basis. Oklahoma has wisely chosen, statutorily and decisionally, to adopt more just laws.

legal action grounded on a promise that the defendant would pay to the plaintiff [for his services] as much as he should *deserve*."[25]

Obviously, the quantum meruit concept ordinarily is not applicable if a contract specifies the quantum to be paid by the recipient of the contract services.[26] And for that reason it does not apply with regard to contingent fee contracts for legal services. There are, however, circumstances which might require invocation of certain quantum meruit-related percentage-yielding criteria—as distinguished from the hourly-rate criterion—in a contingent fee contract situation, for example, where the attorney either dies or is discharged without cause before the contingent event occurs. Since the death of a lawyer is normally not the fault of either party, equity might well apply criteria which differ somewhat from those which apply in the case of an attorney's discharge without cause. In the latter situation, the pertinent criteria for determining the wrongfully discharged attorney's entitlement differ radically from those controlling in a non-contingent fee contract situation.

The applicable law governing the rights of a deceased or wrongfully terminated lawyer who had faithfully served a client pursuant to the terms of a contingent fee contract which provides that the lawyer is to receive as his fee for his services a percentage of any recovery by settlement or judgment entered into by his client is summed up fairly well in the following language from the early *White v. American Law Book Company*[27] decision:

"If the attorney fully performs his agreement until discharged without cause, the measure of his damages should be the compensation named in the contract. The client, in such case, breaks his contract and at least makes it difficult, and in some cases practically impossible, for an attorney to show the amount of his injury under the rule of quantum meruit. If the client prevents the performance which entitled the attorney to specific recompense, it would seem that such amount and interest from the time it became due may be recovered in an action which sets forth such state of facts.... '[T]he measure of damages for such breach of contract is the full contract price, especially when the attorney's work is substantially done, unless some other sum has been agreed upon.'"[28]

So, the question here is not whether attorney Buckman's share of the contingent fee fund is to be determined on a so-called quantum meruit basis. The crucial questions are: (1) What criteria apply in determining the quantum or portion of a contingent fee fund that should go to the lawyer originally hired when the contract was breached before he had a chance to complete performance; (2) did the court apply such criteria here; and (3) whether, under the particular facts and circumstances of this case, the trial court's apportionment clearly is against the weight of the evidence.

Where a client, without cause, chooses to abrogate his lawyer's contingent fee contract and hire another attorney, the discharged lawyer is entitled to receive a portion of the contingent fee if and when the contingent event mentioned in the contract occurs. To this end she may enforce her attorney's lien if she has perfected one. In determining the quantum entitlement of both the discharged lawyer, and the later one, the court should take into consideration that the discharged attorney had a contract, that she undertook the risk of investing time, services, and expenses to achieve a recovery for her client based on the promise that she would receive for her services a fair contractual share of any recovery. And in determining such share, the court should consider: (1) The amount of the settlement or judgment the discharged attorney had a reasonable possibility of realizing had she been permitted to continue in the case; (2) the

---

**25.** Black's Law Dictionary 1119 (5th ed. 1979); Webster's Unabridged Third New International Dictionary 1859 (1986) (emphasis added).

**26.** One caveat: Regardless of what has been agreed to the reasonableness of a lawyer's fee is always subject to challenge by a client.

**27.** 106 Okl. 166, 233 P. 426 (1924).

**28.** *Id.* 233 P. at 427 (quoting *Dolph v. Speckart*, 94 Or. 550, 186 P. 32, 35 (1920)).

nature and extent of the services she rendered within the scope of the contingent fee contract; and (3) the nature and extent of the services rendered by the second lawyer. The proportionalization of each attorney's services, of course, is not to be evaluated on an hourly rate basis, but consideration should be given to the nature of the case, and the relative contribution of each attorney to the creation of the contingent fee fund with considerable emphasis on the first attorney's contractual share. The fact that an attorney may have worked a little slower than some, or did her own investigating, or had to fly by commercial airlines instead of in her own private aircraft, or spent more time doing legal research than some other lawyer may think is necessary, generally should not play a significant part in the determination. The main objective is to evaluate the totality of the involved lawyers' efforts in terms of their proportional contribution to the creation of the fee fund to be divided.[29] The discharged lawyer should not be denied the fruits of her efforts merely because she happens to be young or relatively inexperienced if the evidence discloses that the services she performed were in furtherance of her professional duties under the contract; were carried out with reasonable diligence and propriety; were beneficial to the client's interest; and were appropriate to the fulfillment of her contractual and ethical obligations to her client. Of course, special circumstances may arise which may, as a matter of equity, require the court to reduce the amount of the discharged attorney's portion of the fee. This would be especially true if the second lawyer rendered considerable additional service, *e.g.*, trial, appeal, etc. And, while the experience and reputation of the lawyers are to be considered, the more penetrating focus should be on the relative contributive performance of the competing lawyers to the creation of the contingent fee fund.

In attorney Buckman's contract, it was agreed that he would represent McDaniel in her action against "the City of Tulsa, all available insurance carriers, [and] Officer Bayles, in regard to a wreck 12/4/86." As he points out, his work was substantially done when he was discharged; the matter was "all but ready for a Pre-trial Conference and trial"; and it was because of such efforts that McDaniel was placed in a position to recover the settlement she did without significant effort on the part of attorney Martin. And, to support his claim, attorney Buckman presented records showing that by the time he was discharged he had spent 232.25 hours on McDaniel's behalf—143 hours on her claim against the City and 89.25 hours in pursuit of UM coverage.[30]

Assuming without deciding that attorney Buckman traveled some legal roads a more experienced attorney might have bypassed, such pursuits were in furtherance of his duty to his client, not in dereliction thereof. The evidence supports the court's finding that attorney Buckman did not neglect or compromise his client's interests. Indeed, he correctly advised his client to reject the City's $90,000 offer and began blazing a path toward reaching a speedy settlement with both the City and the UM carrier while at the same time laying a foundation for a potential bad-faith claim against the insurer which targeted a monetary goal far loftier than the destination arrived at by attorney Martin almost three years later.

So, the inescapable fact is that despite his reputation, attorney Martin's entry of appearance in the lawsuit apparently did not have an overwhelming impact on the City attorney because it was almost two years thereafter (and not until after the filing of the civil rights action) before the City finally tendered its relatively low statutory limit of $100,000 [31] on the table. Thus the seriously

---

29. The attorney whose contract is cancelled without cause should, as we said, be given a substantial portion of the fee in most cases, particularly if there is any evidence of third-party interference with the attorney's contractual rights. Of course if there is, the aggrieved attorney should always consider whether she has an action for wrongful interference with her contract.

30. Buckman said that even though McDaniel's claim had been taken on a contingent fee basis, he kept records of his time to determine whether he was efficiently using it to make a profit.

31. Relative to the severity of Ms. McDaniel's injuries.

injured plaintiff had to wait until attorney Martin got around to bringing to fruition the fertile predicatory seeds sown and nurtured by attorney Buckman. Since the settlement the plaintiff ultimately entered into was in an amount her first attorney would probably have achieved, she arguably would have been better off staying with him. But she did not and, consequently, she became, in effect, the beneficiary of a team of competent lawyers, as it were.

An "action to enforce an attorney's lien based on compromise of litigation is an action of equitable cognizance and, unless the judgment is clearly against the weight of the evidence, same will not be disturbed on appeal." [32]

We have examined the record and conclude that Buckman's stewardship of his client's claim was essentially on target and his pre-trial work was, in fact, substantially completed when he was unilaterally discharged by a client in quest of a recovery larger than $150,000.

## IV

Though seemingly inconsistent with his quantum meruit advocacy, attorney Martin complains of its application in calculating the value of attorney Buckman's services rendered to establish UM liability, saying that the trial court erroneously applied a *"quantum meruit* standard, since no *meruit* was added to the *quantum*,"* that is, results "only count and only results are compensated."

As we mentioned earlier, attorney Buckman's contract called for him to prosecute

the claim against "all available insurance carriers," which, of course, would include the UM insurance carriers. Parenthetically, it would seem to follow that Buckman's efforts towards establishing UM liability would likewise be evaluated by the contractual considerations discussed above. However, the parties to this appeal entered into a pretrial stipulation that the trial court could determine the value of attorney Buckman's services in identifying the UM carriers and establishing their liability on a quantum meruit basis using the traditional hourly rate criterion. And the court did so.

Now, however, attorney Martin complains that the hours for which attorney Buckman was compensated are excessive and consist of non-lawyer functions. Needless to say, the only evidence which could be said to support such conclusion consisted of more or less speculative generalizations which evidently failed to persuade the trial court. We do not find the UM service award to be clearly against the weight of the evidence.

## V

▮ Finally, we turn to attorney Buckman's counter appeal in which he complains that the trial court abused its discretion in denying him an attorney's fee as the prevailing party in the fee dispute under 12 O.S. 1991 § 936 [33] (actions to recover under a contract for services), and 42 O.S.1991 § 176 [34] (actions to enforce a lien).[35] He further contends that he is entitled to recover his costs, including an attorney's fee, pursuant to 12 O.S.1991 § 928.[36]

32. *City of Barnsdall v. Curnutt,* 198 Okl. at 3 (syllabus), 174 P.2d at 597 (syllabus).

33. Subject statute reads:
"In any civil action to recover on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, unless otherwise provided by law or the contract which is the subject to the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs."

34. Section 176 provides:
"In an action brought to enforce any lien the party for whom judgment is rendered shall be

entitled to recover a reasonable attorney's fee, to be fixed by the court, which shall be taxed as costs in the action."

35. Attorney Martin's motion to strike a portion of Buckman's reply brief on his counter appeal has been deferred for our consideration. The substance of the motion is that "the first three pages and the first four lines of the fourth page" of the brief "have nothing to do with the attorney fee issue" and are "presented in the nature of 'surreply' on the merits of the principal appeal." We agree and limit our review to discussion of the attorney fee issue.

36. Section 928 states:
"Where it is not otherwise provided by this and other statutes, costs shall be allowed of

Attorney Martin does not attempt to attack the statutory authority or caselaw relied upon by attorney Buckman, but contends that the latter cannot be awarded fees as a prevailing party because he "is not a '*party*'" within the contemplation of these statutes.[37] The argument is that each cited statute must be construed as referring to parties to the original action as distinguished from parties to an ancillary proceeding such as this.

The court agrees.[38] The parties to the primary lawsuit are not involved in the attorneys' fee dispute. This post-settlement ancillary action was instituted by attorney Martin's motion to adjudicate the division of an attorneys' fee fund.[39] It is undisputed that attorney Buckman perfected an attorney's lien on 33 percent of the settlement proceeds.

Nor does this court consider the proceeding as one to enforce a lien within the purview of § 176. It is merely an appeal from an order in an ancillary proceeding to determine the amount of fee to which attorney Buckman is entitled. Here attorneys Buckman and Martin discussed settlement of the former's lien claim. When no settlement was reached, attorney Martin commenced this proceeding to determine the extent of Buckman's attorney lien rights by filing a motion seeking an "Order adjudicating the extent of a certain lien filed herein by plaintiff's former attorney, Steven Buckman" on December 5, 1990. Under these circumstances it is no more than a fee dispute between the two lawyers—Martin and Buckman—notwithstanding that the latter had an attorney's charging lien which, as we said, was perfected when the lawsuit was filed June 4, 1987.[40]

The trial court did not err in denying attorney Buckman's request for an attorney's fee taxed as costs.

## VI

The order appealed is therefore sustained in all respects and attorney Buckman's request for an attorney's fee award for the appeal is denied.

**AFFIRMED.**

course to the plaintiff, upon a judgment in his favor, in actions for the recovery of money only, or for the recovery of specific, real or personal property."

37. Martin contends that *Abel v. Tisdale,* 673 P.2d 836 (Okl.1983), is dispositive. We disagree. Neither *Abel v. Tisdale,* 619 P.2d 608 (Okl.1980) (*Abel I*), nor *Abel v. Tisdale,* 673 P.2d 836 (Okl. 1983) (*Abel II*), are dispositive or on point. *Abel I* requires a court to approve the attorney fee taken out of a minor child's wrongful death recovery, and authorizes a court to reduce the fee, if the evidence warrants. Such evidence was lacking, however, and the court remanded the case for an evidentiary hearing. *Abel II* resulted from that hearing. The court again found no evidence to warrant a reduction of the attorney's contingent fee award. Neither *Abel I* nor *Abel II* raised the issue of whether the attorneys were proper parties, nor how the court should apportion a contingent fee fund between competing claimants.

38. It should be noted that the author of this opinion does not share this view, but is of the opinion that §§ 936 and 176 include parties to ancillary proceedings such as this and that the proceeding initiated by attorney Martin was in its essential nature the functional equivalent of an inverse enforcement of attorney Buckman's Title 42 lien.

39. Attorney Martin filed what he called a "Motion For Determination of Attorney's Lien" in this case on December 5, 1990. It reads as follows:

"COMES NOW C. Rabon Martin, attorney for plaintiff here, and moves for an Order adjudicating the extent of a certain lien filed herein by plaintiff's former attorney, Steven Buckman.

This case has been settled and attorney Buckman is entitled to be compensated for the reasonable value of his services performed up to his termination and replacement by the undersigned attorney.

WHEREFORE, premises considered, the undersigned prays that the court set this Motion for hearing to determine the compensation to which attorney Buckman is entitled and that the balance of the recovery be deemed unburdened by the lien asserted by attorney Buckman herein."

40. Title 42 O.S.1991 § 34. It reads as follows:

"Innkeepers, boardinghouse keepers, attorneys-at-law and others have liens which are defined and regulated."

42 O.S.1991 § 176 provides:

"In an action brought to enforce any lien the party for whom judgment is rendered shall be entitled to recover a reasonable attorney's fee, to be fixed by the court, which shall be taxed as costs in the action."

TAYLOR, P.J., concurs.

STUBBLEFIELD, J., concurs in result.