MILLER V. MAGNUS



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:MILLER V. MAGNUS

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 MILLER V. MAGNUS
2019 OK CIV APP 62
Case Number: 116993
Decided: 10/01/2019
Mandate Issued: 10/30/2019
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2019 OK CIV APP 62, __ P.3d __

 

KELLY R. MILLER, Plaintiff,
v.
JOSEPH A. MAGNUS, LEE R. LINSENMEYER, III, and CENTRAL RURAL ELECTRIC COOPERATIVE, INC., an Oklahoma corporation, Defendants,
GREGORY MEIER and KEN PRIVETT, P.L.C., Appellants,
v.
MARTIN, JEAN & JACKSON Appellee.
APPEAL FROM THE DISTRICT COURT OF
PAYNE COUNTY, OKLAHOMA
HONORABLE PHILLIP CORLEY, TRIAL JUDGE
AFFIRMED
Gregory G. Meier, MEIER & ASSOCIATES, Tulsa, Oklahoma, for Appellants
Michael P. Martin, MARTIN, JEAN & JACKSON, Stillwater, Oklahoma, for Appellee
P. THOMAS THORNBRUGH, JUDGE:
¶1 The firm of Gregory Meier and Ken Privett, P.L.C. (Meier and Privett), appeal a decision by the district court apportioning 100 percent of a contingency fee to the firm of Martin, Jean & Jackson (MJ&J). On review, we find the district court acted within its discretion.
BACKGROUND
¶2 The district court made substantial findings of fact that we will use as the basis for this summary. On or about June 15, 2014, Plaintiff Miller was involved in a motor vehicle collision. Miller was injured by a truck driven by Joseph Magnus. Magnus was a 17 year-old high school student at the time, and was driving a truck pulling a trailer with a backhoe. Magnus swerved to avoid a truck owned by Central Rural Electric Cooperative (CREC) which was stopped in the roadway. In doing so, Magnus's truck crossed the centerline and collided with Miller's vehicle. On June 18, 2014, Miller entered into a contract with MJ&J to represent his interest in claims against the potential Defendants arising out of the collision. The contract provided MJ&J would be compensated under a 33 1/3 percent contingent fee on the gross amount recovered if this case was resolved before a lawsuit was filed, or 40 percent of the gross amount recovered if suit was filed.
¶3 Shortly after being retained, MJ&J initiated the claims process as to Magnus's parents' insurance and Miller's s own insurer. MJ&J settled the property damage claim with the Magnuses' insurer. MJ&J did not charge a fee for settling the property damage claim. MJ&J submitted Miller's medical bills to his own insurer and obtained the medical payment of policy limits of $100,000.00, which was disbursed to Plaintiff. MJ&J negotiated with Miller's health insurance provider to waive its subrogation interest of $225,883 as to the medical payments coverage. No fee was charged to Miller for this work.
¶4 MJ&J obtained a policy limit offer of $250,000.00 from the Magnuses' insurer.[1] Miller did not wish to accept the offer at that time, and requested MJ&J to investigate whether Defendant Magnus had any collectable assets to pursue over the $250,000.00 policy limits. MJ&J arranged a recorded statement of Defendant Magnus and hired another investigator to investigate potential claims against the CREC driver, Lee Linsenmeyer, Ill and CREC. On January 21, 2015, MJ&J received a letter from Defendant Magnus's counsel reiterating the policy limit offer.
¶5 On February 11, 2015, Michael Martin of MJ&J had a meeting with Miller to discuss case status and strategy. Miller stated that he did not want to file a lawsuit at that time. On March 25, 2015, Martin sent Miller a letter asking Miller if he was ready to proceed on the potential claim against CREC. On April 11, 2015, Martin sent Miller a second letter asking Miller to call and discuss the best way to proceed on his case.
¶6 On April 23, 2015, Miller entered a second attorney client agreement and fee agreement with Meier and Privett,[2] but did not inform MJ&J until they received a letter from Miller terminating MJ&J as his counsel on May 7, 2015. On May 15, 2015, Gregory Meier also advised MJ&J that he had been retained by Plaintiff to continue his claims against Defendants. On May 19, 2015, MJ&J notified counsel for Magnus, Miller's new counsel, and the insurance claim representative that MJ&J claimed an attorney's lien.
¶7 On July 30, 2015, Meier and Privett filed a petition for negligence against Defendants Magnus, Linsenmeyer, and CREC.[3] Meier and Privett negotiated a compromise resolution of Aetna's health insurance lien claim from $400,000 down to $85,000 on behalf of Miller. They also achieved a release of hospital lien from St. Francis Health System and a release by the Warren Clinic. Miller then settled his case against Defendant Magnus for the previous policy limits offer of $250,000.00, and Magnus was subsequently dismissed from the lawsuit.[4] On January 22, 2016, MJ&J filed an attorney's lien with the Payne County clerk and filed a Notice of Lien.
¶8 On January 12, 2017, Miller filed a motion to strike and invalidate MJ&J's January 26, 2016, notice of attorney's lien. Through a series of procedural detours, this eventually evolved into a hearing on the allocation of attorney's fees generated by the $250,000 settlement with the Magnuses' insurer. MJ&J claimed that they were entitled to $83,333.33 in contingency fees (a 33 1/3 percent share of the $250,000) plus some expenses. Meier and Privett also claimed that they were entitled to $83,333.33 in contingency fees, and that MJ&J were entitled only to their expenses.
¶9 In a written order dated August 28, 2017, the district court found that MJ&J's lien was valid. It also found:
. . . that MJ&J were discharged by Plaintiff Miller without cause. This court finds the amount settled by Plaintiff with Defendant Magnus was the same amount negotiated by MJ&J, the $250,000.00 policy limit. Based on Martin v. Buckman [1994 OK CIV APP 84], the court finds that MJ&J is entitled to their contingent fee amount of $84,555.15.
Meier and Privett filed a motion for new trial within 10 days, which was denied by the district court. Meier and Privett now appeal.
STANDARD OF REVIEW
¶10 "The reasonableness of attorney fees depends on the facts and circumstances of each individual case and is a question for the trier of fact." Parsons v. Volkswagen of America, Inc., 2014 OK 111, ¶ 9, 341 P.3d 662. "The standard of review for considering the trial court's award of an attorney fee is abuse of discretion." Id. "Reversal for an abuse of discretion occurs where the lower court ruling is without rational basis in the evidence or where it is based upon erroneous legal conclusions." Id.
ANALYSIS
¶11 The questions presented are these: 1) did MJ&J have a valid attorney's lien in this matter; and 2) if so, what portion, if any, of the result obtained should be attributed to Meier and Privett's work for contingency fee purposes?
I. THE MJ&J LIEN
¶12 Meier and Privett argue on appeal that MJ&J did not perfect a valid attorney's lien in this matter, and hence have no lien claim on the settlement funds for fee purposes. We find, however, no evident argument regarding liens in Meier and Privett's motion for new trial. The motion for new trial acts to limit the issues reviewed on appeal to those raised by that motion. Onyekuru v. Farmers Ins. Co., 2000 OK 81, ¶ 4, 20 P.3d 812 (citing 12 O.S.2001 § 991(b); 6 Okla.Sup.Ct.R. 1.22(c)(1); and City of Broken Arrow v. Bass Pro Outdoor World, L.L.C., 2011 OK 1, ¶ 11, 250 P.3d 305).[5] 

II. THE APPORTIONMENT OF THE FEE

¶13 Meier and Privett argued in the district court that MJ&J could not recover fees because it had no attorney's lien. Therefore, they argued, they were entitled to a full 33 1/3 percent contingency fee of $83,333. As noted at n.5 of this Opinion, the lien question is immaterial. In its motion for a new trial, Meier and Privett argued that it was entitled to an apportionment of the fees generated by the $250,000 settlement.[6] The apportionment doctrine in such cases is set out in Martin v. Buckman, 1994 OK CIV APP 89, ¶ 42, 883 P.2d 185. The court should consider:
(1) The amount of the settlement or judgment the discharged attorney had a reasonable possibility of realizing had she been permitted to continue in the case; (2) the nature and extent of the services she rendered within the scope of the contingent fee contract; and (3) the nature and extent of the services rendered by the second lawyer. 
Martin further notes that:
The proportionalization of each attorney's services, of course, is not to be evaluated on an hourly rate basis, but consideration should be given to the nature of the case, and the relative contribution of each attorney to the creation of the contingent fee fund with considerable emphasis on the first attorney's contractual share. 
A. The Services Performed by Meier and Privett
¶14 Meier and Privett argue that they performed two services that contributed to "the creation of the contingent fee fund." The first was taking the deposition of Defendant Magnus. Meier and Privett argue that this was necessary because Miller did not believe his prior counsel's assurance that neither Magnus nor his parents had any worthwhile assets to collect beyond the liability insurance limits, and was reluctant to approve a settlement that would release Magnus. Meier and Privett eventually reached the same conclusion as MJ&J, that Magnus and his parents had no other significant reachable assets. Meier and Privett argue, however, that this deposition had a role in creating the contingent fee fund because Miller would not have accepted the settlement without it. The second act of Meier and Privett was to negotiate down the outstanding medical liens against the settlement, thereby increasing the amount Miller actually received from the settlements.
¶15 We sympathize with the difficulty presented to the trial court in this matter, because these theories do not appear to have been raised before in any reported apportionment case. Generally the work performed by the second firm in the reported apportionment cases clearly adds some value that was not there while the first firm had the case. In Duffy v. Cope, 2000 OK CIV APP 140, ¶ 10, 18 P.3d 366, by example, a $250,000 settlement offer was raised to $600,000 after the second firm worked the case. Meier and Privett cites Sheffer v. Carolina Forge Co., LLC, 2017 OK CIV APP 39, 401 P.3d 225, as instructive, but neither theory raised here was discussed in that case. In Sheffer, Plaintiff's third counsel, GLC, conducted a mediation that led to a settlement agreement for the sum of $610,000.00. The case makes no mention of any prior settlement offer by the defendant. The work done by GLC in Sheffer clearly contributed new work towards to the creation of the fee fund to be divided. Even so, the trial court awarded GLC only 25 percent of the available contractual fee, and COCA upheld this distribution.[7] We find no similar facts here.
1. The Deposition of Magnus
¶16 Meier and Privett argued in their motion for new trial that taking the deposition of Defendant Magnus contributed to the fee fund because Plaintiff Miller "demanded the deposition be taken" and would not settle without it. It also states that Miller would not settle without a determination that no other insurance coverage was available. Meier and Privett's appellate brief implies that Miller believed that Magnus may have been engaged in the business of an employer at the time of the accident (because he was pulling a trailer with a backhoe) or that Magnus' parents might have some other insurance or assets that might be reachable besides their $250,000 policy.
¶17 MJ&J testified that they had already received an affidavit from the Magnuses' insurer stating that no other coverage existed; that they had arranged a recorded statement of Defendant Magnus; and that their investigator had done an asset check regarding any assets of Magnus and his parents, produced a 96 page report; and found nothing worth pursuing. MJ&J argued that Meier and Privett essentially conducted the same investigation and reached the same conclusion, and MJ&J should not be penalized because their ex-client wished to control the method by which facts were established, or hire another firm to duplicate their work.
¶18 It is undisputed that Meier and Privett did not succeed in increasing the settlement fund offered by the Magnuses' insurer. Nor did they obtain any other apparent concession, such as not having to release Magnus as part of the settlement. Nor did they uncover any new facts or any other source of potential damages. The firm's sole contribution in this area was to convince their client that there was nothing more to be gained from Magnus and his parents. The question before us is whether this act constitutes a "proportional contribution to the creation of the fee fund to be divided." We find no existing case law remotely addressing this theory.[8] 
¶19 Returning to the original factors stated by Martin, fees are apportioned based on the "relative contribution of each attorney to the creation of the contingent fee fund with considerable emphasis on the first attorney's contractual share." Id., ¶ 42. We are doubtful that confirming the work of prior counsel for a skeptical client constitutes a contribution to the creation of a contingent fee. Meier and Privett's theory implies that a client could hire and fire, for example, four different counsel in sequence, simply because the client believes that each counsel has failed to discover a new source of potential damages, and all four firms may have a fee entitlement for confirming the same facts.

¶20 If any of these hypothetical firms actually discover potential new targets for suit, or new monetary sources to satisfy damages, they could certainly be said to have contributed to the creation of a contingent fee. But to split the first firm's fee among three others simply because they confirmed the first firm's analysis of available sources of damages appears both inequitable, and to set an unfortunate precedent. We find that making a second investigation that confirmed the results of MJ&J's investigation did not contribute to the creation of a contingent fee in this case, and does not require a fee allocation.
B. The Lien Reductions
¶21 Meier and Privett's next argument is that they negotiated down various medical liens which would otherwise have consumed the entire settlement, and this constitutes a contribution to the creation of the contingent fee fund. MJ&J argue that lien negotiations are a normal part of settling a case, and are not normally considered to contribute to the contingency fee amount in any way because the fee is based on the gross recovery from the tortfeasor, not on the amount the client eventually receives. We find it clear that MJ&J could not have claimed a 33 1/3 percent fee on the $250,000, and an additional fee for negotiating down the liens.
¶22 The question is, therefore, whether Meier and Privett can receive compensation for performing work that MJ&J would have performed without additional compensation. This question is evidently not addressed by any published case. Assuming that lien reductions do contribute to the creation of the contingent fee fund pursuant to Martin, equity suggests that such a recovery may be possible if some action of the second firm made it possible to negotiate a lien reduction the first firm could not have achieved. Meier and Privett argues in its brief that it did perform such an action. Page 8 of its brief-in-chief states that it was able to achieve the lien reductions because it had created the prospect of recovering additional funds through "additional litigation with other defendants that [MJ&J] had not pursued."
¶23 If correct, this claim could demonstrate that Meier and Privett had added some value to the case. The brief does not identify the "other defendants" that MJ&J had not pursued, but it is apparently referring to the utility, CREC, and its driver, Linsenmeyer. The district court found, however, that on March 25, 2015, MJ&J sent Miller a letter asking Miller if he was ready to proceed on the potential claim against CREC. On April 11, 2015, Martin sent Miller a second letter asking Miller to call and discuss the best way to proceed on his case, but Miller did not respond. The court's finding is clear that MJ&J did not decline to pursue CREC, but was prevented from doing so by its client.
¶24 As we noted previously, case law is scarce on this issue, and no case raises the theories that we have seen here. Although Meier and Privett clearly performed legitimate work on this case, we find no indication pursuant to the factors announced in Martin, that this work contributed to the establishment of the contingent fee fund.
CONCLUSION
¶25 Our standard of review is abuse of discretion and, pursuant to that standard, we find the district court acted within its discretion.
¶26 AFFIRMED.
REIF, S.J. (sitting by designation), and FISCHER, P.J., concur.
FOOTNOTES
[1] Although not explicitly stated, it appears that Magnus was a covered driver under his parents' insurance policy, and had no personal policy.
[2] For much of the record, the firm is referred to as "Meier and Associates" but it appears on appeal as "Gregory Meier and Ken Privett, P.L.C." We will use the term "Meier and Privett" throughout.
[3] Magnus was never served, however.
[4] The docket sheet in this case indicates that in January of 2019, after three and a half years of inconclusive litigation, Miller voluntarily dismissed his claims without prejudice as to the remaining defendants.
[5] The argument is also irrelevant to any apportionment. A lien does not create the obligation of the client to pay the attorney. The attorney client contract creates this obligation. The lien decides priority, and also may make a payor liable if a lower priority claimant is paid without satisfying the prior lien. The question of the lien is also irrelevant in a contingency fee-fund apportionment proceeding. Apportionment is not based upon which firm has a priority lien or any lien at all.
[6] Meier and Privett's motion for new trial appears to have been made on the grounds that a material change in the law occurred after submission for decision, in the form of Sheffer v. Carolina Forge Co., LLC, 2017 OK CIV APP 39, 401 P.3d 225. Sheffer, however, states the same apportionment doctrine and factors as Martin v. Buckman, 1994 OK CIV APP 89. It is not new authority.
[7] There is a common misapprehension that occurs when citing cases decided under an abuse of discretion standard. Meier and Privett's citation implies that, because the Sheffer Court found 25 percent to be within the court's discretion, that Sheffer also holds that 0 percent would have been outside the court's discretion. This is not correct, even if the acts undertaken by Meier and Privett and GLC were substantively identical (which they are not). Two courts may reach opposite decisions based on the same facts, and still be within their discretionary powers.
[8] The Meier and Privett contract also stated that "you [the client] are not liable to us for any attorney fees arising out of any prior settlement offer in the matter which may be claimed by any previous attorney you retained." No party raised the issue of whether this clause has any effect on Meier and Privett's right to recover a contingency on the $250,000 settlement that was offered before Miller changed counsel.




 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2000 OK CIV APP 140, 18 P.3d 366, 72 OBJ 174, DUFFY v. COPE
Discussed
 1994 OK CIV APP 89, 883 P.2d 185, 65 OBJ 3395, Martin v. Buckman
Discussed at Length
 1994 OK CIV APP 84, 883 P.2d 1283, 65 OBJ 3713, Beck v. Phillips Colleges, Inc.
Cited
 2017 OK CIV APP 39, 401 P.3d 225, SHEFFER v. CAROLINA FORGE COMPANY, LLC
Discussed at Length
Oklahoma Supreme Court Cases
 Cite
Name
Level

 2011 OK 1, 250 P.3d 305, CITY OF BROKEN ARROW v. BASS PRO OUTDOOR WORLD, L.L.C.
Discussed
 2014 OK 111, 341 P.3d 662, HESS v. VOLKSWAGEN OF AMERICA, INC.
Discussed
 2000 OK 81, 20 P.3d 812, 71 OBJ 2667, ONYEKURU v. FARMERS INS. CO.
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 991, Right to Perfect Appeal to Supreme Court without Filing Motion for New Trial - Exemption
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA